**Irwin POPKIN, Plaintiff,**

v.

**Michael D. DINGMAN et al.,
Defendants.**

**No. 72 Civ. 1232.**

United States District Court,
S. D. New York.

Oct. 25, 1973.

Rubin, Wachtel, Baum & Levine, New York City, for plaintiff; Martin A. Coleman, New York City, of counsel.

Paul Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Dingman and Halliday; Simon Rifkind and Paul J. Newlon, New York City, of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendant Wheelabrator-Frye; Robert von Mehren, and Paul E. Konney, New York City, of counsel.

ROBERT L. CARTER, District Judge.

## OPINION

This is an action arising under § 16(b) of the Securities Exchange Act of 1934

(the "Act"), 15 U.S.C. § 78p(b). Jurisdiction rests under § 27 of the Act, 15 U.S.C. § 78aa.

Plaintiff sues on his own behalf, on behalf of all stockholders of Wheelabrator-Frye, Inc. similary situated, and on behalf of and in the right of the corporation itself. In a motion for summary judgment, plaintiff asks this court to impose liability upon defendants Dingman and Halliday, as corporate insiders, for profits realized from the alleged sale and exchange of securities within a six-month period.[1] The motion is denied and summary judgment is granted to the defendants.

I. *Factual Background*:

The essential facts in this case are not in dispute. Allied Equities is a public industrial corporation with approximately 5,300 stockholders and 2,000,000 outstanding shares. Its stock is traded in the over-the-counter market. During the relevant period, defendant Dingman was a director of Allied Equities and defendant Halliday was a director and Chairman of the Board of Directors. They were not a part of the management of the corporation. During this same period Dingman owned between 3.4% and 4.8% of the outstanding shares of Allied Equities and Halliday owned between 12% and 14%.

Dingman and Halliday were also active in the affairs of Wheelabrator-Frye, Inc., and were "insiders". Dingman was a director, as well as President, and Halliday was Chairman of the Board. Wheelabrator-Frye is a public corporation with common stock registered and traded on the New York Stock Exchange. This stock has been subject to the provisions of the Act.

Allied Equities owned a large block of stock in Wheelabrator-Frye, which it purchased on January 14, 1971. On March 22, 1972, due to a need for income and working capital by Allied Equities, the company sold its stock in Wheelabrator-Frye at a significant appreciation in value. The decision to sell the stock was proposed and approved by the Board of Directors, with defendants Dingman and Halliday abstaining from the vote. The proceeds of the disposition were used to pay off most of the company's long-term debt.

During the six-month period immediately preceding the Allied Equities sale, Dingman and Halliday had individually purchased shares of common stock of Wheelabrator-Frye for a price per share which was less than the per share price in the Allied Equities sale.

■ The elements necessary for Section 16(b) liability are a purchase and sale of a non-exempt security by an insider, within six months, which results in the realization of a profit by the insider. The plaintiff contends that the sale by Allied Equities and the purchase by Dingman and Halliday was a purchase and sale within the meaning of the Act and that both defendants realized a profit thereby. It is plaintiff's position that Dingman and Halliday's pro rata portion of the shares of Wheelabrator-Frye which were sold by Allied Equities within six months of their own acquisition, may be matched against the shares which they acquired individually. Each individual's pro rata portion of the shares of Wheelabrator-Frye stock which were sold by Allied Equities is to be computed from that individual's percentage equity interest as a stockholder in Allied Equities. The difference in price between the matched portions bought and sold is to be considered profit for which the defendants are liable.[2] The

---

1. The individual defendants, Dingman and Halliday, purchased shares in Wheelabrator-Frye, Inc. for themselves and within six months of that purchase Allied Equities, the Board of which Dingman and Halliday served on, sold corporate-owned shares in Wheelabrator-Frye. These shares had been owned by the corporation for more than six months.

2. The plaintiff contends that Allied Equities, by waiting to sell its shares of Wheelabrator-Frye until four months after the individual defendants purchased shares of Wheela-

central issue is whether liability can be imposed on a stockholder-director for his company's sale and his own purchase within the previous six months of that sale, of securities of another company of which he is an "insider".

## II. *Application of Governing Legal Principles*:

The relevant language of § 16(b) of the Securities Exchange Act of 1934 provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . . . This subsection shall not be construed to cover . . . any . . . transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b).

One of the major purposes of the Act, as declared in Section 2, 15 U.S.C. § 78b, was "to insure the maintenance of fair and honest markets" in securities transactions. Section 16(b), designed to implement this overall objective, bars the unfair use of inside information by making it unprofitable for "insiders" to engage in short-swing speculation. See Feder v. Martin Marietta, 406 F.2d 260 (2 Cir.), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1969); Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966).

To serve this purpose, Congress established a relatively arbitrary rule capable of easy administration. It was recognized that the section's success as a deterrent was rooted in its simplicity and automatic application. Blau v. Lamb, *supra*, at 516; Bershad v. McDonough, 428 F.2d 693, 696 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). Responsibility for observance of the provision was put upon the "insider", since he was deemed capable of structuring his purchases and sales so as to avoid liability. (*Bershad, supra*, at 696.)

In an attempt to serve the dual objectives of preventing insider abuse and applying the statute in an easily definable manner, the courts have utilized both an "objective" and "subjective" approach. The objective approach takes the statutory requirements and applies them as broadly as the language permits. This is done without regard to the intent of the insider, the actual knowledge or use of insider information for speculation, or even whether speculative abuse was possible. See, *e. g.*, Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

"As applied to 'purchases' and 'sales' as those terms are ordinarily understood in the law, the Congress allowed no loophole by which the insider could avoid the impact of the statute. In the case of such ordinary purchases and sales, it mattered not to whom, why or how the insider sold." Morales v. Arlen Realty & Development Corp., 352 F.Supp. 941, 944 (S.D.N.Y.1973).

What is clear from these cases, is that the statute is applied objectively to transactions which come within the ordinarily understood meaning of "purchase and sale". Ordinary purchases and sales have always been understood

---

brator-Frye, was able to realize a benefit in excess of $2,500,000 due to the increased price of the stock over the four-month period. This benefit to the corporation, it is alleged, resulted in a profit for its individual shareholders.

to be those enacted by the insider. Although "sale" can and has been interpreted broadly to include sophisticated exchanges, in every instance the individual held liable must have performed acts, by himself or through his alter ego, constituting the actual acquisition and disposition of securities.

In the immediate case, Dingman and Halliday did not dispose of any securities. The sale of Wheelabrator-Frye stock was the act of Allied Equities. The corporation's sale cannot be treated as the defendant's sale without disregarding the requirement that the insider engage in the transaction. Dingman and Halliday could not control or prevent the sale of Wheelabrator-Frye stock by Allied Equities and it would be illogical and beyond any accepted understanding of corporate organization to attribute the act of the corporation to them.

In addition, Dingman and Halliday cannot be said to have realized a profit when the proceeds of the sale went to the corporation and their only interest was that of a shareholder. Few cases have dealt with the issue of when a profit is "realized", and the logical inference to draw from this is that as normally applied, the term provides little difficulty. In Heli-Coil Corp. v. Webster, 352 F.2d 156, 167 (3d Cir. 1965), in determining whether real profits as opposed to paper profits were realized, it was assumed that since Congress did not define the terms "realize" or "profit", it intended them to have their ordinary and usual meaning.

"Measuring the terms 'profit' and 'realize' in conjunction, we think it is clear that Congress intended that ordinarily no gain in the value of securities should be deemed to be realized as a profit under the Act until there had been a *definitive act* by the *owner* of the securities whereby the paper value of the securities has become a *real and an includible one* . . . ." 352 F.2d at 167–168. (Emphasis added.)

Dingman and Halliday were not the "owners" of the stock. They performed no "definitive act", and the value of the proceeds was not "real and includible" to them. Allied Equities converted an investment into cash and used it to pay off debt. While the transaction was obviously in the financial interest of the corporation, its shareholders did not even "realize" a distribution on their shares, let alone a real or paper profit. Thus, defendants cannot be held to any liability under the objective approach.

■ The subjective approach is applied in cases where "alternative constructions of the terms of § 16(b) are possible." Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972). See, also, Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966); Morales v. Arlen Realty & Development Corp., 352 F.Supp. 941 (S.D.N.Y.1973). In such cases, the question commonly asked is whether the transaction involved the possibility of insider speculative abuse; the terms are then given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders. Most frequently, the statute is applied in this manner in order to analyze whether a sophisticated or unorthodox transaction is a "purchase" or "sale". It has been applied to conversions, options, stock warranties, reclassifications and other sophisticated methods by which securities are purchased or disposed of. The United States Supreme Court, in applying guidelines for use of the subjective approach, related them to "borderline transactions" which might be considered "purchases" and "sales". Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

The subjective approach, however, in emphasizing the broad purpose of preventing speculative abuse, is not utilized in wholesale disregard of the language of the statute or beyond the reasonably intended extent of its coverage. The immediate case does not involve a "sophisticated", "unorthodox" or "borderline" transaction; corporations frequently buy and sell securities of other

companies and these transactions are not imputed to their individual directors or stockholders. In *Kern, supra*, the Supreme Court recognized that the evil which Congress sought to prevent was "the realization of short-swing profits"; Dingman and Halliday, as shareholders, realized no short-swing profit on the sale by Allied Equities.

Plaintiffs rely heavily on the argument that the securities transactions of partnerships are attributed to the partners thereof to the extent of their pro rata equity interest in the partnership for the purpose of imposing liability under § 16(b). They assert that there is no basis for distinguishing securities transactions of corporations in relation to stockholder-directors from those of partnerships. While there have been decisions imputing the action of partnerships to the individual partners, under § 16(b), this is consistent with traditional notions of partnership law, and there is no suggestion that the holdings of these cases should be extended beyond the partnership situation. (See Rattner v. Lehman, 193 F.2d 564 (2d Cir. 1952); Blau v. Allen, 163 F.Supp. 702 (S.D.N.Y. 1958); Blau v. Lehman, 286 F.2d 786 (2d Cir. 1960), aff'd, 368 U.S. 403, 82 S. Ct. 451, 7 L.Ed.2d 403 (1962).

Some very basic differences in the nature of corporate and partnership form are relevant. A partnership is an association of two or more persons, to carry on as co-owners a business for profit. See Uniform Partnership Act, § 6. A partner is a co-owner with his partners of specific partnership property; his interest in the partnership consisting of his share of profits and surplus is personal property. (Uniform Partnership Act, § 26.) Profit sharing is the essence of partnership. Profits of ordinary business transactions are shared as well as non-recurring gains from the sale of fixed assets. Thus, each partner has a definite and fixed profit interest in the

securities transactions of his partnership. He "realizes" profit when the partnership does.[3] Additionally, each partner is an agent of the partnership for the purpose of its business. (Uniform Partnership Act, § 9.) His action binds the partnership and vice versa; the acts of both are synonymous in terms of authority and liability. Thus, when the partnership buys and sells securities, it is a purchase and sale of each partner.

Directors are not agents of the shareholders who elect them. They are fiduciaries with duties running primarily to the corporation. (Henn, Law of Corporations, 415 (2d ed. 1970). While the stockholders indirectly own the corporation, they do not manage it, and the acts of management are not attributed to them individually. Property of the corporation, including securities, belongs to it and not to the stockholders. A corporate shareholder's proprietary interest amounts to his ownership of stock, not corporate property, and a right to assets on dissolution of the corporation. A shareholder's profit interest from a particular corporate transaction is merely a hope, and clearly not more than a speculative estimate. It is a remote proprietary interest.

The few cases that have considered attribution of a corporation's investments to a director or shareholder have been limited to the specialized situation where the corporation was the investment vehicle or alter ego of the individual. In Blau v. Mission Corp., 212 F.2d 77 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954), a non-diversified, closed-end management investment company was under the absolute control of the defendant, and thus that company's transactions were attributed to the defendant. The company had no other function than to hold the defendant's investment; its holdings were

---

3. See, e. g., Blau v. Lehman, 286 F.2d 786 (2d Cir. 1960), aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), where the individual partner, Thomas, was found to have "realized" $3,893.41, which was his proportionate share of the profits of Lehman Brothers, derived from the purchase and sale of securities by the partnership.

the holdings of the defendant. Similarly, in Blau v. Lamb, 242 F.Supp. 151 (S.D.N.Y.1965), aff'd in part, rev'd in part, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), the corporation which purchased and sold securities was a holding company for interests solely of the defendant; defendant was beneficial owner of nearly 100% of its stock. In light of his beneficial ownership of nearly all the stock and his control over the directors and their decisions, the defendant was held liable for the transactions of the company.

Plaintiff cites the case of Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962 (S.D.N.Y.1965) for the proposition that the "corporate form is itself without significance under § 16(b) of the Act, for the securities transactions of a corporation will be attributed to its stockholders just as the securities transactions of a partnership are attributed to the members thereof." (Plaintiff's Brief at 35.) The context of the case is significant in demonstrating the inaccuracy of plaintiff's assertion. Andreas was the sole trustee of 19 trusts which held together 100% of the stock of the Andreas Corporation. The trust beneficiaries were members of Andreas' family. Andreas himself was the trustee and beneficiary of a revocable trust which held 24.9% of the Andreas Corporation stock. The Corporation's principal asset was a large block of North American Company stock. This stock was exchanged for Marquette stock, the Board of which Andreas served on. The Marquette stock was sold within six months. The exchange and later sale were deemed to

come within the scope of § 16(b). The court assumed that the holdings of Andreas Corp. could be attributed to Andreas, who was the insider. An implicit consideration was that Andreas, as trustee, held all the shares of the Andreas Corporation, and was totally responsible for the investments of the corporation. The corporation was, in effect, an investment vehicle; it was under the absolute control of the nineteen trusts, of which Andreas was trustee, and its primary function was investment. His ownership and control made the sale by the corporation his sale. What was also of distinguishing significance was that it is ". . . clear that through the trust, of which he was a beneficiary, Andreas realized a profit within the meaning of Section 16(b) . . . ." (Marquette, 239 F.Supp. at 967.) Andreas was deemed to be a beneficial owner of the stock held by the investment vehicle and his profit was a very definite amount, based upon the trust of which he was a beneficiary.

In the immediate case, Allied Equities has none of the attributes of a personal holding company, especially not one used as an investment vehicle. It is a public industrial company. Dingman and Halliday had minority interests in Allied Equities, which did not approach absolute control.

■ Section 16(a) of the Securities Exchange Act, 15 U.S.C. § 78p(a) [4], requires full disclosure by specified insiders of their ownership of, and transactions in, the securities of the corporation of which they are insiders. It is related to § 16(b) as a companion method of curbing speculative abuse by insiders. In pursuance of its power under § 16

---

4. The text provides:

"Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78l of this title, or who is a director or an officer of the issuer of such security, shall file, . . . a statement with the Commission . . . of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been a change in such ownership during such month, shall file with the Commission . . . a statement indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month."

(b), the SEC has promulgated a rule which exempts from liability under § 16 (b) any transactions exempted from the reporting requirements of § 16(a). 17 C.F.R. § 240. 16a–10 (1973)[5]. While it has been held that § 16(a) cannot be conclusive in exempting transactions from liability under § 16(b), and that it is only to have slight significance (see Feder ·v. Martin Marietta Corp., 406 F.2d 260, 268 (2d Cir. 1969), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L. Ed.2d 681 (1970); *Marquette, supra,* 239 F.Supp. at 967), it is relevant in determining, to some extent, the kinds of transactions Congress and the SEC view as coming within the scope of insider trading restrictions. See Rattner v. Lehman, 193 F.2d 564, 565–566 (2d Cir. 1952); Adler v. Klawans, 267 F.2d 840, 847 (2d Cir. 1959).

If a person does not own securities either beneficially or directly, and does not have to meet the requirements of § 16(a), then it is unlikely that the sale of these securities or profits derived therefrom can be considered his sale or profits. Partners have been required to file as to securities owned by their partnership. (See SEC Reg. § 241, 1965, Release No. 34–1965, December 21, 1938, 11 F.R. 10970.) Stockholders and directors of corporations are not generally required to file reports under § 16(a) as to securities owned by the corporation of which they are such a stockholder or director. The only requirement as to filing and disclosure by stockholders and directors relates to holding companies where the company merely provides a medium through which a person invests or trades in securities, and where the company has no other substantial business. *Id.* at 10971. This is in harmony with the reasoning of the three corporate cases described above. The corporations were in effect the alter egos of the individual defendants.

In sum, the participation of a partner in a partnership or of a controlling owner in a holding company which is his personal investment vehicle is of such a nature that the purchase and sale by the organization could be attributed to the individual. This does not exist in the relationship of the defendants Dingman and Halliday to Allied Equities. In addition, the proprietary interest of the partner and controlling owner is so direct that he could be said to have "realized a profit" from a particular transaction by the organization. This, too, is absent in the average stockholder-corporation relationship, as present here.

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and summary judgment is entered in favor of defendants, dismissing the complaint.

So ordered.

5. The Rule provides:
    "Any transaction which has been or shall be exempted by the Commission from the requirements of section 16(a) shall, in so far as it is otherwise subject to the provisions of section 16(b), be likewise exempted from section 16(b)."