David MATAS, Plaintiff,

v.

Charles P. SIESS, Jr., Glen A. Nelle, W. E. McDowell, E. H. Bailey, John Doe, Richard Roe and Michael Moe (the names John Doe, Richard Roe and Michael Moe are fictitious, the true names being unknown to the plaintiff), and Apco Oil Corporation, Defendants.

No. 76 Civ. 3255 (CBM).

United States District Court, S. D. New York.

Jan. 19, 1979.

Garwin & Bronzaft by Bertram Bronzaft, New York City, for plaintiff.

Fried, Frank, Harris, Shriver & Jacobson by Marc P. Cherno, New York City, for defendants Siess, Nelle, and McDowell.

Cahill, Gordon & Reindel by Thomas F. Curnin, New York City, for defendant Apco Oil Corp.

*Memorandum Opinion on Defendants' Motion to Dismiss*

MOTLEY, District Judge.

I. FACTS

This action under Section 16(b) of the Securities Exchange Act of 1934 [1] raising difficult issues of application of that statute is before the court on the motion of defendants Siess, Nelle, and McDowell, joined in by defendant Apco Oil Corporation, pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss the complaint for failure to state a cause of action. The motion is denied for the reasons set forth below.

Plaintiff is a stockholder of Apco Oil Corporation (Apco), suing in its behalf. The facts as set forth below follow the allegations of the complaint, which must be taken as true for purposes of this motion to dismiss. Apco's common stock is traded on the New York Stock Exchange. The sequence of events leading up to this litigation began in 1972, when Apco adopted a stock option plan ("the plan") for compensation of certain key employees. In connection with the plan, the optionees were given stock appreciation rights (SAR's). These SAR's gave the optionees the right to receive, either in cash or in stock at their election, the increase in the value of the optioned shares from the date of grant of the option to the date of exercise of such rights. The defendants herein, Charles P. Siess, Glen A. Nelle, W. E. McDowell, D. H. Bailey and John Doe, Michael Moe and Richard Roe,[2] are officers and/or directors of Apco, who allegedly were given stock appreciation rights under the plan. At unspecified times between January 1, 1975 and the filing of the complaint in this action on July 23, 1976,[3] the seven defendants allegedly exercised stock appreciation rights under the plan, receiving aggregate profits of $408,602, most of which was paid to them in cash.[4]

Plaintiff alleges that each exercise of stock appreciation rights for cash under Apco's plan constituted a simultaneous purchase and sale of a security by an insider within six months, and the consequent gen-

1. 15 U.S.C. § 78p(b). The court is vested with jurisdiction by virtue of § 27 of the Act, 15 U.S.C. § 78aa, as amended.

2. These are, according to the complaint, "fictitious names of officers of Apco, the true names being unknown to plaintiff."

3. This case was placed on the suspense calendar of this court on November 8, 1976, pending the outcome of the Second Circuit's decision in the *Rothenberg* case, *infra*, which it was hoped might be dispositive of some of the issues in this action. It was removed from the suspense calendar on March 30, 1978.

4. This aggregate figure breaks down as follows:

| Name | Number of Rights Exercised Upon | Market Value on the Date of Exercise of SAR * | Option Price | Profit Realized | Profit Settled In Cash | Profit Settled in Apco Stock |
|---|---|---|---|---|---|---|
| Seiss | 21,938 | $ 493,515 | $353,925 | $139,590 | $139,590 | — |
| Nelle | 1,013 | 22,856 | 13,168 | 9,688 | 9,688 | — |
| McDowell | 1,688 | 41,778 | 21,942 | 19,836 | — | 19,836 |
| Bakely | 2,683 | 63,409 | 34,226 | 29,183 | 16,794 | 12,389 |
| Roe, Doe & Moe | 23,557 | 539,189 | 328,884 | 210,305 | 178,580 | 31,725 |
| | | $1,160,747 | $752,145 | $408,602 | $344,652 | $63,950 |

* = stock appreciation right

eration of short-swing profits which should have inured to the issuer (Apco) under § 16(b).[5] Plaintiff further contends that each of the defendants exercised stock appreciation rights as a device to conceal what would otherwise clearly have been illegal transactions under § 16(b).

Defendants' response is that even if all the allegations of the complaint are taken as true, plaintiff has failed to state a cause of action. Defendant bases this conclusion on two basic grounds: first, that an actual purchase and sale are required to create such liability, both of which cannot possibly arise out of a single transaction, such as the exercise of a stock appreciation right; and second, that no liability may be found under § 16(b) where only one investment decision is made within the statutory six-month period. Defendant draws these conclusions principally from a group of recent Supreme Court decisions construing § 16(b), *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Kern County Land Co. v. Occidental Petroleum*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); and *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 *reh. denied*, 405 U.S. 969, 92 S.Ct. 1162, 31 L.Ed.2d 244 (1972); and from two recent cases from this District wherein the exercise of stock appreciation rights was held to give rise to no liability under § 16(b), *Freedman v. Barrow*, 427 F.Supp. 1129 (S.D.N.Y. 1976); and *Rosen v. Drisler*, 421 F.Supp. 1282 (S.D.N.Y.1976).

**5.** § 16(b) provides, in pertinent part, that:
  For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into

## II. DISCUSSION

### A. SECTION 16(b)—THE OBJECTIVE APPROACH VS. THE SUBJECTIVE APPROACH

■ Section 16(b) of the Securities Exchange Act was originally intended to operate as a "relatively arbitrary rule capable of easy administration."[6] Irrespective of any motive or intent on the part of a covered officer, director, or ten percent shareholder of an issuer to indulge in short-swing trading on the basis of inside information, any profits gained from sales and purchases or purchases and sales within a period of six months or less were made recoverable by the statute. For many years the statute did operate almost mechanically, with courts applying it in what has come to be known as the "objective approach".[7]

Then came a series of cases demanding the application of the statute to transactions which were not classic purchases and sales for cash, such as stock conversions, mergers, and stock options. The courts developed the so-called "subjective approach" in response to these situations, finding 16(b) liability whenever the transaction in question was of a type likely to involve the potential for the sort of speculative abuses which § 16(b) was designed to prevent.

In the words of the Supreme Court: "In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside informa-

such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . .

**6.** *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970) *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

**7.** The high-water mark of the "objective approach" is perhaps best exemplified by the 1947 decision of the Second Circuit in *Park & Tilford v. Schulte*, 160 F.2d 984 (2d Cir.), *cert. denied sub nom. Schulte v. Park & Tilford*, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947).

tion—thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits."[8]

The "subjective" (or "pragmatic") approach was designed to moderate the harshness of the application of § 16(b)'s "liability without fault" standard to situations which, though arguably involving some equivalent of a § 16(b) purchase and sale, could not possibly allow for insider speculation and profiteering on non-public information.

■ The rule is still as it was stated by the Second Circuit in 1970, in *Newmark v. RKO General*:

> "Whether certain 'unorthodox' transactions, well illustrated here by the exchanges of securities incident to a merger . . . , are 'purchases' or 'sales' for the purpose of section 16(b) cannot be resolved by mere reference to the words of the statute. In such cases, the determination of the statute's relevance must rest, initially, on whether there exists the potential for evil against which the statute was intended to guard. . . . Only when an opportunity for speculative abuse is present is it necessary to determine whether the transactions alleged to give rise to 16(b) liability may fairly be characterized as insider purchases and sales."[9]

The exercise of Apco stock appreciation rights for cash is clearly an unorthodox transaction within the meaning of the above quoted decisions, and this court so holds. *See also Freedman v. Barrow, supra,* and *Rosen v. Drisler, supra.* Thus, the court must turn its attention to the question of whether or not such exercise presented a possibility of speculative insider

abuses, so that § 16(b) purchases and sales should be found.

## B. THE POSSIBILITY OF SPECULATIVE ABUSE IN THE EXERCISE OF SAR'S

One common thread running through many of the cases where *no* liability was found is the tendency to involve involuntary participation on the part of those alleged to have engaged in short-swing trading.[10] Thus, no 16(b) liability was found in *Kern County Land Co. v. Occidental Petroleum, supra,* a case where a would-be acquiring company was left with a large block of shares in the target company following an unsuccessful merger attempt. The unsuccessful tender offeror subsequently exchanged stock of the target company for stock of a third company which had entered into a defensive merger with the target, and also granted an option to purchase such stock which was not exercisable until the expiration of a six-month period.[11]

The Supreme Court held § 16(b) inapplicable to these facts, and was substantially influenced by the fact that the unsuccessful tender offeror had had no choice, once the defensive merger had been consummated, but to exchange its shares in the target company for stock in the new constituent corporation along with all other target shareholders.[12]

■ The case at hand is clearly a very different one from the perspective of voluntariness. First, defendants had control over the timing of the exercise of their respective stock appreciation rights, within the confines of the dates of maturation of those rights and the expiration of Apco's 1972

---

8. *Kern County Land Co. v. Occidental Petroleum,* 411 U.S. 582, 594–5, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973).

9. *Newmark v. RKO General,* 425 F.2d 348, 351 (2d Cir.), *cert. denied,* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91, U.S. *reh. den.,* 400 U.S. 920, 91 S.Ct. 172, 27 L.Ed.2d 161 (1970); *see also American Standard, Inc. v. Crane Co.,* 510 F.2d 1043 (2d Cir.), *cert. denied* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1974).

10. The foremost example of this is found in *Kern County, supra,* 411 U.S. 582, 600, 93 S.Ct. 1736, 36 L.Ed.2d 503. *See also* 27 *Hastings L.J.* 679 (1976): "Involuntariness and Other Contemporary Problems under § 16(b) of the Securities and Exchange Act of 1934," and cases cited therein.

11. *Kern County, supra,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503.

12. *Ibid.,* at 600, 93 S.Ct. 1736.

stock option plan. Further, defendant holders of stock appreciation rights had the choice of exercising the stock options, themselves, so as to receive Apco stock in exchange for payment to the corporation of the option price. Second, defendants had the choice of receiving the equivalent, *in Apco stock*, of the spread between the option price and the stock's market price on the date of exercise. It is abundantly clear that if defendants had elected either of these two available alternatives, and then sold Apco stock within a six-month period at a profit, § 16(b) liability would have arisen, since for purposes of § 16(b), optioned stock is deemed purchased on the date of exercise of the stock option, not on the date when the option is granted. *Silverman v. Landa*, 306 F.2d 422 (2d Cir. 1962); *Levy v. Seaton*, 358 F.Supp. 1 (S.D. N.Y.1973).

The third choice available to defendants, and the one specifically challenged here, was the right to exercise their stock appreciation rights and receive in *cash* the difference between the option price and the market price of Apco stock on the date of exercise. Whatever else may be said of this choice, it was entirely voluntary. *See Makofsky v. Ultra Dynamics Corporation*, 383 F.Supp. 631 (S.D.N.Y.1974).

■ Plaintiff's allegation that Apco's stock appreciation rights were created to enable optionees to evade liability under § 16(b) is of little significance, as defendants herein have pointed out. As the Supreme Court held in *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972):

> "Liability cannot be imposed *simply* because the investor structured his transaction with the intent of avoiding liability under § 16(b). *The question is, rather, whether the method used to 'avoid', liability is one permitted by the statute.*"

404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (emphasis supplied). In *Reliance Electric* a 10% owner of securities sold enough shares to reduce its holdings down to 9.96%, and later disposed of the remaining shares, with both the purchase and the two subsequent sales occurring within a six-month period. The court declined to impose liability because the defendant was not a 10% owner at the time of both the purchase and the sale, citing the language of the statute itself:

> "This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved . . ."

15 U.S.C. § 78p(b).

Nothing said by the Court in *Reliance Electric* suggests, however, that *any* transaction designed to escape liability under § 16(b) will in fact succeed. Indeed, the Court noted:

> "To be sure, where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders."

404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575. The Court also pointed out that for purposes of finding the existence of purchases and sales under the statute "courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse." 404 U.S. 418, 424, at n. 4, 92 S.Ct. 596, 600, 30 L.Ed.2d 575.

As will be developed further below, this court cannot find that the methods used by defendants here to avoid liability is one permitted by § 16(b) within the meaning of *Reliance Electric.*

The facts of this case contrast sharply with those of the two cases in which stock appreciation rights have been considered from the perspective of § 16(b), both of which arose in this District. In *Rosen v. Drisler*,[13] defendants were, like defendants here, entitled by their corporation to exercise stock appreciation rights for cash. However, unlike the present defendants,

---

13.  *Rosen v. Drisler*, 421 F.Supp. 1282 (S.D.N.Y. 1976).

the *Rosen* defendants had "absolutely no control over the making of the offer or the date at which the option was to be appraised."[14] The *Rosen* defendants were corporate officers who had fallen from favor. As the court there observed:

"If anything, [defendants] took advantage of . . . [the corporation's] desire to remove from their hands the ability to acquire substantial amounts of voting stock, and not of an opportunity afforded them as insiders to realize a profit or avoid loss through a short-swing in investment position, the abuse sought to be controlled by 16(b)."[15]

*Freedman v. Barrow*[16] is the second of the two previous cases involving stock appreciation rights. The optionee/defendants there could control the timing of the exercise of those rights, like defendants here and unlike those in *Rosen*. However, in *Freedman* the issuing corporation retained the right to determine whether the stock appreciation rights would be paid in stock or in cash. Additionally, all optionees who were either officers or directors of the issuer (including the defendants) were expressly denied the right to receive cash under the *Freedman* option plan. Thus, the *Freedman* defendants were required, at a minimum, to retain a continuing investment position with the issuer, although the availability of stock appreciation rights clearly enabled them to lessen the extent of their holdings and still escape § 16(b) liability. The potential for speculative abuse inherent in the transactions was thus much less than in the case at bar.[17]

Here, contrary to the objective of the Congress in enacting § 16(b), defendants were in a position to act, on the basis of inside information, to realize a profit on the value of their stock option rights by timing their exercise to coincide with peaks in the market for Apco's stock and to possibly avoid future loss. Defendants could then get out with no further stock involvement in the company (at least not on account of option stock). Defendants thus would have had everything to gain, and nothing to lose, by indulging in exactly the kind of conduct which § 16(b) was designed to inhibit—realization of short-swing profits by insiders.

The *Freedman* defendants, on the other hand, could not take such advantage of inside information—particularly adverse information—without becoming locked into an investment position for at least six months. The *Freedman* court declined to find 16(b) liability on the facts presented to it but explicitly recognized that a case involving a stock appreciation right exercisable for *cash* might well require a different result.[18]

This court is in agreement that where stock appreciation rights are exercisable for cash, the possibility of speculative abuse clearly exists. The officer or director is in a position, by exercising stock appreciation rights for cash, to reap a profit which he speculates may not be realizable a few months hence, based on inside information. Having found the possibility of speculative abuse, it is next necessary to decide whether we have a purchase and sale within the contemplation of § 16(b).

## C. PURCHASE AND SALE WITHIN SIX MONTHS REQUIREMENT

Defendants argue that the recent trend of Supreme Court and other decisions has been to find liability only in situations clearly covered by the express terms of § 16(b). They argue that § 16(b) is inapplicable here because there is no separate purchase and sale when stock appreciation rights are exercised for cash more than six months after the grant. They assert further that the exercise of the grant for cash constitutes a single transaction and a single

14. *Ibid.*

15. *Ibid.*, 421 F.Supp. 1282.

16. *Freedman v. Barrow*, 427 F.Supp. 1129 (S.D. N.Y.1976).

17. *See, Freedman, supra*, 427 F.Supp. 1129, 1153. This conclusion is also voiced in Herzel and Perlman, 33 *Bus.Law.* 749 (1978): "Stock Appreciation Rights".

18. *Freedman, supra*, 427 F.Supp. 1129, 1153.

investment decision within six months, and not a separate purchase and sale or two investment decisions within six months as required by § 16(b).

██ This court disagrees with defendants' view of the effect of the exercise of stock appreciation rights for cash. Since an option is a purchase only when it is exercised,[19] not when it is granted, there was a purchase here. Therefore, the fact that an optionee may have held the rights for more than six months is simply irrelevant. Next, there was the receipt of cash, representing the difference between the purchase price of the shares (option price) and the market price of those same shares on the date of exercise, plainly a sale.

Defendants must admit that if they had received only stock for the exercise of their grant and had sold those stocks for a profit immediately thereafter or at any time within six months, § 16(b) would have been violated. Why a wholly voluntary simultaneous purchase and sale, *with the possibility of speculative abuse*, should be exempted and found outside the statute has not been satisfactorily explained.

Further, the court finds that defendants' argument is not warranted by the cases on which they rely. In the Supreme Court's most recent opinion on the subject, *Foremost-McKesson v. Provident Securities, supra*, for example, the court declined to hold § 16(b) applicable to the very purchase of securities by virtue of which a ten percent beneficial owner of securities reaches that threshold level of stock ownership, so as to become a § 16(b) statutory insider. The statute by its terms purports to apply only to purchases or sales by one who is a ten percent beneficial owner of an issuer's securities "at the time of purchase." The court observed that:

"When Congress has so recognized the need to limit carefully the 'arbitrary and sweeping coverage' of § 16(b) . . .

courts should not be quick to determine that, despite an acknowledged ambiguity, Congress intended the section to cover a particular transaction."[20]

Although the Court might appear at first blush to be espousing a "strict constructionist" approach to § 16(b), defendants should observe that the court was concerned, in *Foremost-McKesson*, with a problem of construction as to which it found an ambiguity *inherent in the statutory language itself.* The problem facing the court here, in contrast, is the treatment of a device which requires analysis to determine whether the statute is applicable. The court finds that no stretching of the statute is necessary to find a purchase and sale here within the contemplation of § 16(b).

██ Another distinction noted by the court in *Foremost-McKesson* is relevant here:

"The legislative discourse revealed that *Congress thought that all short-swing trading by directors and officers was vulnerable to abuse because of their intimate involvement in corporate affairs.* But trading by mere stockholders was viewed as being subject to abuse only when the size of their holdings afforded the potential for access to corporate information. These different perceptions simply reflect the realities of corporate life."[21]

Here defendants are not "mere stockholders", who may or may not have peculiar access to inside information by virtue of their stock ownership. They are officers and directors who, the Congress believed in enacting § 16(b), should be treated most rigorously of all under the statute.

Defendants have attempted to make much of some language in a recent decision of a judge in this District, affirmed by the Court of Appeals, to the effect that no § 16(b) liability could be found where a defendant was found to have made only one investment decision within the course of the

---

**19.** *Silverman v. Landa, supra*, and *Levy v. Seaton, supra*.

**20.** *Foremost-McKesson, supra*, 423 U.S. 232, 252, 96 S.Ct. 508, 520, 46 L.Ed.2d 464.

**21.** *Foremost-McKesson, supra*, 423 U.S. 232, 253, 96 S.Ct. 508, 520, 46 L.Ed.2d 464 (emphasis supplied).

statutory six-month period. The case of *Rothenberg v. United Brands*[22] involved the purchase of a large block of shares by the defendant company in another company, and the subsequent conversion by the defendant of the purchased shares into another class of securities pursuant to a plan of recapitalization. The district court held that no cause of action under § 16(b) was stated as a matter of law and granted summary judgment for defendant. The distinction between that case and this is apparent from the language used by the court:

> "Turning to the undisputed facts of this case, United [the defendant] made only one investment decision and that was to purchase 340,000 shares of Foster pursuant to the tender offer. When United exchanged or converted these common shares into Class A, *the total amount of its investment in Foster did not change.* While it is true that United would not have made the tender offer without Foster's agreement to the recapitalization plan, *this tying-together of two transactions did not create a speculative risk.* Furthermore, unlike the typical § 16(b) sale, *United received no cash or other property upon the conversion or exchange.*"[23]

In the case at bar, the problem is, of course, precisely that the defendants "cashed out" and made a profit. As discussed above, this court finds significant possibility of speculative abuse at the time of the exercise of these stock appreciation rights for cash.

Other cases cited by defendants are similarly distinguishable. In *Blau v. Max Factor & Co.,* 342 F.2d 304 (9th Cir.), *cert. denied,* 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965), the purchase and sale alleged to create § 16(b) liability were, respectively, (1) the conversion by corporate insiders of common stock of the issuer into Class A stock of the same company, and (2) the subsequent sale, little more than a month later, of the Class A stock. The court declined to impose § 16(b) liability on

the ground that the transaction presented no possibility of speculative abuse. The defendants had been long term (between 5 and 32 years) holders of the company's voting (common) stock, who wished to make more of such stock available to the public. The two classes of securities involved in the conversion were equivalent in all respects (including price), except that lower dividends were payable on the common, a matter fully within control of the defendants. The Ninth Circuit ruled, in affirming the district court's grant of summary judgment in favor of the defendants:

> "[T]he making of the exchange, and its timing, were simply irrelevant to the use of insider information in short-term speculation —the problem with which section 16(b) is concerned. If appellees acted upon inside information in disposing of their stock interest when they did, the exchange was unrelated to that fact— they could have done so quite as well, at exactly the same time, realizing precisely the same profit, without converting their Common to Class A at all [and with no exposure to liability]. So also, the nature, duration, and amount of their investment, the temptation and opportunity to trade on inside information, and the profit to be had by doing so, would all have been the same had the exchange been accomplished six months or more before the sale. In these circumstances, to hold that the exchange of Common for Class A constituted a 'purchase' within section 16(b) would ignore the distinction which Congress drew between long-term investment and short-term speculation."

342 F.2d 304, 309 (emphasis supplied). To recapitulate, the Ninth Circuit refused to find a section 16(b) violation in *Blau v. Max Factor* because the conversion alleged to constitute a § 16(b) purchase in no way increased the possibility of speculative abuse. In essence, the court regarded the *Blau* defendants as having simply disposed

---

22. *Rothenberg v. United Brands,* [CCH] Fed. Sec.L.Rep. '77–78 Dec. ¶ 96,045 (S.D.N.Y.), *aff'd* 573 F.2d 1295 (2d Cir. 1977) (without opinion).

23. *Rothenberg, supra,* [CCH] ¶ 96,045, p. 91,-694 (emphasis supplied).

of their long term investment in the company by public sale, a transaction in no way comprehended by section 16(b). As the court put it:

"The exchange of Class A for common did not interrupt the continuity of appellees' investment; it did not increase or decrease the amount invested, or alter in any way the risk assumed long years before . . . Thus, [defendants] made only one investment decision in the six months' period—the decision to terminate their long-term investment by sale."

342 F.2d 304, 308. In the case at bar, on the other hand, defendants determined first to exercise their stock option rights and second to do so in such a way as to realize a cash profit based on the then current market situation and, possibly, information about possible events in the near future not known to the public. Valuable rights to acquire Apco stock were instantly converted to cash profits. A better case of short-swing trading can scarcely be imagined.

Defendants also rely on *Popkin v. Dingman,* 366 F.Supp. 534 (S.D.N.Y.1973), to support their proposition that "under the plain language of the statute, there must be both a separate purchase and a separate sale of securities within a six-month period for there to be Section 16(b) liability, and that a single transaction cannot serve 'double duty' by being 'deemed' to be both the purchase and sale required for Section 16(b) liability." (Defendants' memorandum of law in support of their motion to dismiss at p. 12). The relevance of *Popkin* to defendants' legal theories founded upon it and, indeed, to the legal controversy presented here, is not apparent to this court. *Popkin* merely holds that purchases of stock by corporate directors may not be matched up with sales of stock of the same issuer by the corporation on whose board they sit, where their stock holdings in the second company are not substantial and they had no opportunity to influence or control the corporation's sale.

Finally, defendants cite *DelNoce v. Jomarco, Inc.* [CCH] Fed.Sec.L.Rep. ¶ 93,954 (S.D.N.Y.1973) as "perhaps the most closely analogous decision" prior to *Rosen v. Drisler* and *Freedman v. Barrow, supra,* the two previous cases explicitly concerned with the treatment for purposes of § 16(b) of stock appreciation rights. In *DelNoce* the § 16(b) defendant was the controlling shareholder of one company which had purchased a large block of stock in another company before the two consummated a merger. When the merger was completed, stock of the target company was exchanged for stock of the new constituent corporation. The complaint alleged that the defendant had completed a short-swing transaction, and sought to match sales of target company stock with alleged purchases of the new security resulting from the merger. The *DelNoce* plaintiff also alleged that shares of the target company owned by its merger partner and exchanged pursuant to the plan of conversion were economic equivalents of the new stock which resulted from the merger, and thus that the conversion should have been regarded as a simultaneous purchase and sale of the new stock on the same day, leading to liability under section 16(b). The court rejected both contentions. In so doing it stated that:

"[N]o case has been cited to the Court where simultaneous *exchanges or cancellations of shares upon the consummation of a merger* have been held to give rise to a cause of action under § 16(b). Such simultaneous transactions are not within the intent of § 16(b), because they do not create, in and of themselves, *the opportunity for reaping speculative profit from the unfair use of information.* There is no time for swing upward or downward in the price of the securities related to the exposing of inside information."

*DelNoce, supra* [CCH] Fed.Sec.L.Rep. ¶ 93,-954, at pp. 93,805–6 (S.D.N.Y.1973) (emphasis supplied).

Defendants wish to place much reliance on this language of the court, which is really mere dictum, as the result in *DelNoce* was compelled, as to the first claim, by *Newmark v. RKO General (supra).* Further, they overlook certain significant differences from the case presented here.

*DelNoce* did not involve the receipt of cash in exchange for stock, but was rather concerned with the exchange or conversion of securities of *two different issuers* pursuant to a merger, a situation to which the courts have repeatedly refused to attach liability under section 16(b). *DelNoce, supra,* at p. 93,805; *Newmark v. RKO General, supra.* The court rejected the second 16(b) claim in *DelNoce,* which rested on a theory of economic equivalence between the two securities being exchanged there, again because securities of two different issuers were involved. In such a case, the theory of economic equivalence is not applicable. *DelNoce, supra,* at 93,806.

The *DelNoce* court's refusal to find liability on grounds of simultaneity, citing *Newmark v. RKO General* yet again, is a curious straw for defendants to grasp at. In *Newmark* the court imposed liability on corporate insiders who exercised an option to purchase securities at a fixed price, since the fluctuating market price of the securities enable them to reap a speculative profit, just as in the case at bar. 425 F.2d 348, 353. Thus defendant's reliance on this authority is misplaced.[24]

### D. CONCLUSION

In light of all the authorities discussed above, the court holds that plaintiff has clearly stated a cause of action. If he succeeds in proving his allegations at trial, then Apco will be entitled to recover for violations of § 16(b) on the part of the defendants Siess, Nelle, Bailey, Doe, Moe and Roe herein, arising from their purchases and sales of securities within a six-month period through exercise of their stock appreciation rights for cash at their own election.

Defendants' motion to dismiss must therefore be denied, except as to defendant McDowell, who received no cash on the exercise of his stock appreciation rights. As to him, the motion is granted.

SO ORDERED.

---

**24.** *Since the instant motion to dismiss was* brought before the court, the Securities Exchange Commission ("The Commission") has adopted a position on the treatment of stock appreciation rights for purposes of § 16(b) which makes it clear that the Commission is also of the view that these devices are fraught with potential for abuse.

In its Release No. 34–13,659, adopted June 22, 1977 and effective June 30, 1977 (17 C.F.R. § 241.13659), the Commission amended its Rule 16b–3 to create a "window period" within which stock appreciation rights may be exercised for cash without 16(b) liability. The "window period" was adopted as "the most effective means available for preventing the misuse of confidential information by insiders *without unduly burdening those involved in a* stock appreciation rights plan." Vol. 5 [CCH] Fed.Sec.L.Rep., p. 19,095–4. The new Rule 16b–3 was expressly made prospective in application only.

Under the new rule 16b–3(e), cash settlements of stock appreciation rights are made exempt from the operation of § 16(b), if *inter alia,* the appurtenant stock option plan provides that the stock appreciation rights are not exercisable during the first six months of their term, and the plan is administered by a disinterested board of directors which is empowered to determine the form (i. e., in cash or stock) in which payment can be made, and to consent to or disapprove the election of a participant to receive cash. Additionally, an election to exercise a stock appreciation right for cash may only be made between the third and twelfth day following release of the corporation's quarterly and annual *summary statements of sales* and earnings.