Murray J. ROSEN, Plaintiff,

v.

William A. DRISLER, Jr., et al., Defendants.

No. 73 Civ. 3367 (JMC).

United States District Court, S. D. New York.

Oct. 21, 1976.

Garwin & Bronzaft, New York City (Bertram Bronzaft, New York City, of counsel), for plaintiff.

Sullivan & Cromwell, New York City (Marvin Schwartz, New York City, of counsel), for defendants Powers and O'Sullivan.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (John Logan O'Donnell, New York City, of counsel), for defendants Drisler, Whitmore and Lear.

## OPINION

CANNELLA, District Judge.

Moving defendants' (William Drisler, Jr., Edward Whitmore, Robert Lear, Richard Powers and John O'Sullivan) application for an order dismissing the complaint for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, is granted. Plaintiff's cross-motion for summary judgment against these defendants, is denied.

## FACTS

This is a shareholder's derivative action brought on behalf of Indian Head, Inc. ("Indian Head") by Murray Rosen. Indian Head is a public corporation whose stock is registered and traded on the New York Stock Exchange, a national stock exchange as defined by the Securities Exchange Act of 1934.[1] The individual defendants, with the exception of Whitmore and Drisler, are present and former directors of Indian Head. Whitmore and Drisler were employees and officers of the corporation during the occurrence of the transactions which gave rise to the instant litigation.

The complaint, succinctly setting forth the claimed violations, and the other papers before the Court on these motions set out the following scenario.

On December 1, 1961, Indian Head granted a stock option to defendant Edward C. Whitmore, then a corporate vice president. The option, issued under Indian Head's restricted option plan, was originally for the purchase of 10,000 shares of common stock at $34.00 per share; later stock splits necessitated an adjustment in the option to 15,-

1. Jurisdiction is founded upon Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and diversity of citizenship. Plaintiff alleges violations of Sections 10, 14, 16 and 29, 15 U.S.C. §§ 78j, 78n, 78p, 78cc, as well as of Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5.

000 shares at $22.67 per share. The option extended for a period of ten years.

Indian Head granted a similar option to defendant William Drisler, Jr., another of Indian Head's vice presidents, on October 18, 1966. This five year option was for the purchase of 15,000 shares of Indian Head common stock at $20.125 per share.

Robert W. Lear, president and a member of the board of directors of Indian Head, was also granted an option for Indian Head common stock. This option, by agreement dated May 26, 1970, was for a term of five years and covered 10,000 shares at a price of $15.75 per share.

Apparently, these options were granted as incentives to the named officers, designed to give each employee a personal stake in the success of the corporation. During 1971 and 1972, however, it was determined that these individuals would no longer play a key role in the corporation's management. As a consequence of this decision, Indian Head concluded that their acquisition of a proprietary interest in the firm would no longer serve any corporate purpose. Thus, in August 1971 Whitmore was given the opportunity to surrender his option rights in return for the spread between the option exercise price and the mean market price of Indian Head common stock on the day of approval of the transaction by the Indian Head board of directors. Whitmore accepted this offer, and it was approved by the board at the August 24, 1971 meeting. This resulted in a payment of $147,500 to Whitmore.[2] Although the situations surrounding the purchases of the option rights from Drisler and Lear were somewhat more complicated,[3] each was likewise offered an opportunity to exchange his option for cash. Drisler agreed to the proposal on August 1, 1971, and later received a payment of $160,000.[4] Lear agreed to surrender his option rights in August of 1972 and was paid $128,000 therefor.[5]

Basing his contentions on these undisputed facts, plaintiff argues that the purchases of the option rights were actually devices conceived to conceal simultaneous exercise of the options at the exercise price and sale of the shares thus acquired at the higher market value, thereby thwarting the proscription of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), against short-swing insider trading. As a consequence, the argument goes, defendants Drisler, Lear and Whitmore should be required to account to Indian Head for the 16(b) profits realized as a result of these transactions.

Plaintiff also alleges that the above described purchase of option rights was in contravention of the terms of the Indian Head option plans under which they were granted. Because the board of directors knowingly permitted such transactions, they are accused of both violating their fiduciary duty to Indian Head and engaging in a scheme to defraud the corporation, a violation of SEC Rule 10b–5. Thus, the directors who authorized the payments to Drisler, Whitmore and Lear are sued herein to indemnify Indian Head for the damages

2. The board of directors approved the "buy-out" of Whitmore's stock option at a meeting held on August 24, 1971. The mean market price of Indian Head common stock on this day was $32.50, resulting in a spread per share of $9.83 ($32.50 – $22.67 = $9.83): a total of $147,-450 for 15,000 shares.

3. Drisler and Lear agreed to the sale of their option rights as part of comprehensive plans restructuring their employment relationships with Indian Head.

4. The cost of cancelling Drisler's option was computed in a manner similar to that used for Whitmore. The $160,000 payment approximated the difference between a market value of

$30.80 per share and the option exercise price of $20.125.

5. There is a slight discrepancy regarding the manner in which Lear's option rights were valuated. Defendants assert that the average closing price of Indian Head common stock for selected dates was referred to (Affidavit of Richard J. Cutler, dated November 7, 1973 ¶ 18), while plaintiff maintains that the mean market value on July 28, 1972, the day the Indian Head board of directors approved the transaction, was used. Resolution of this controversy, however, is not material to the instant motions. In any event, it appears that the

suffered by virtue of these allegedly unlawful acts.[6]

The case is presently before the Court on the motions of defendants Richard J. Powers and John E. O'Sullivan, members of the Indian Head board of directors during the relevant time period, and of Drisler, Lear and Whitmore, to dismiss the complaint for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), and for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1). Plaintiff has cross-moved for summary judgment against the moving defendants. Fed.R.Civ.P. 56.

## DISCUSSION

### The Section 16(b) Claim

■ The question raised herein, apparently one of first impression, is whether the purchase of stock option rights by the issuer more than six months after their grant results in the realization of short-swing profits within the scope of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).[7] This Court holds that it does not.

Plaintiff maintains that Section 16(b) liability should attach because the option cancellations, as indicated by the manner in which the payments were computed, had the same effect as if Whitmore, Drisler and Lear had exercised their options and on the same day sold the shares thus acquired at the market price. Because this would have constituted a purchase and sale of securities within six months and would have resulted in a 16(b) transaction within the literal meaning of the section, defendants Drisler, Lear and Whitmore, it is argued, should not be permitted to escape the statute's proscription by cleverly structuring the maneuver to avoid liability.

In this regard plaintiff argues that the Court should find guidance in the following language of *Bershad v. McDonough*, 428 F.2d 693 (7th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971):

> The insider should not be permitted to speculate with impunity merely by varying the paper form of his transactions. The commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock.

*Id.* at 697. However, the option cancellations herein were not merely shams de-

---

amount used was $28.56 per share, as compared to the option price of $15.75.

**6.** Plaintiff also avers that an Indian Head proxy statement dated February 26, 1971, seeking stockholder approval of the 1971 stock option plan, was false and misleading in that it failed to inform Indian Head stockholders that certain officers who held options under *prior* plans would be permitted to cancel their stock options in contravention of such plans. However, as no action taken as a result of that proxy statement is challenged herein, the Court sees no relevance of this claim to the issues herein. *See Garwin v. Cox*, No. 72–1220, slip op. at 8 (S.D.N.Y. October 23, 1973) (Metzner, J.).

**7.** Section 16(b) provides:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

signed to disguise what in reality were purchases and resales of the stock involved. Each was a bona fide surrender of stock option rights to the issuer, entered into in lieu of the *alternative* of an exercise of the option followed by sale of the stock so acquired within six months.[8]

The Court likewise does not agree that plaintiff's proposed "alternative" test is the appropriate one. The fact that an alternative manner of carrying out a transaction which would violate 16(b) is available does not render another method of completing the transaction violative of the section. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 600, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

Furthermore, liability may not "be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972). Where, as here, the questioned transaction is an "unorthodox" one (to wit, one that does not fall within the literal meaning of 16(b)), the courts have been directed to follow the pragmatic approach adopted by the Supreme Court and to examine "whether or not the transaction in question could possibly lend itself to the types of speculative abuse that the statute was designed to prevent," *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 n. 26, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973), in considering whether such transactions come within the ambit of 16(b).

Section 16(b) states *in haec verba* that it was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by [an insider] by reason of his relationship to the issuer . . . ." It "was designed to protect the 'outside' stockholders against at least short-swing speculation by insiders with advance information." *Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir.), *cert. denied*, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). Throughout the memoranda filed by plaintiff with respect to the instant motions, plaintiff echoes these teachings in maintaining that, where a particular transaction presents the possibility for this type of speculative abuse, it should be considered within the purview of Section 16(b). Yet conspicuously absent from the arguments presented is an explanation of how the challenged transactions herein give rise to speculative abuse or constitute short-swing speculation by insiders—the only speculation regulated by the section. The Court finds that in fact the disputed transactions do not give rise to the possibility of speculative abuse of the type proscribed by Section 16(b) of the Securities Exchange Act of 1934.[9]

All of the cases cited by plaintiff in favor of his arguments regarding the utility of the stock option as a tool for speculation and abuse of inside information deal either

---

8. At this juncture it is worthy of note that the option cancellations were not engineered by defendants Drisler, Lear and Whitmore but were sought by Indian Head, when it became apparent that they no longer would be occupying control positions within the corporation, to ensure that large blocks of its stock would not fall into their hands.

9. Indeed, the Securities and Exchange Commission has recently indicated as much in proposing an amendment to its Rule 16b–3, 17 C.F.R. § 240.16b–3, which would exempt from the operation of the section the cancellation or surrender of a qualified stock option. See 41 Fed.Reg. 19,983 (1976). However, in that SEC regulations may not always be consonant with the avowed purposes of 16(b), *see Perlman v. Timberlake*, 172 F.Supp. 246 (S.D.N.Y.1959) (Ryan, J.), this Court considers de novo the effect of such a transaction.

On one occasion the SEC was asked to state whether Section 16(b) applied to the exercise of a stock appreciation right payable in cash and, if so, the consequences thereof. Towers, Perrin, Forster & Crosby, Inc., [1973–1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,756 (1974). *Stock appreciation right* was defined as "an optioner's right under an employee stock option plan to elect to receive the difference between the market value of optionable shares as of the exercise and option grant dates in cash or shares of stock, in lieu of exercising a stock option." *Id.* at 84,036. The Commission declined to take a position on this issue.

with the granting of the option, *e. g., Bershad v. McDonough*, 428 F.2d 693 (7th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); or the exercise thereof, *e. g., Keller Indus., Inc. v. Walden*, 462 F.2d 388 (5th Cir. 1972); *Brenner v. Johnson*, 328 F.Supp. 149 (E.D.Wis.1971), *modified*, 467 F.2d 1080 (7th Cir. 1972); *Volk v. Zlotoff*, 285 F.Supp. 650, 657 (S.D.N. Y.1968) (Herlands, J.); *Perlman v. Timberlake*, 172 F.Supp. 246 (S.D.N.Y.1959) (Ryan, J.), and have characterized such a transaction as either a purchase *or* a sale, but not as both. Thus, these decisions are inapposite in a case such as this, where plaintiff attempts to characterize the surrender of rights as both a purchase and a simultaneous sale for 16(b) purposes.

For example, in *Perlman v. Timberlake* this Court concluded that exercise of an option granted by the issuer and sale of like stock within a six month period would allow the insider to take just as much advantage of short-term market fluctuations as would a market purchase and subsequent sale, and thus would give rise to the same possibility for insider speculative abuse. 172 F.Supp. at 256. In the instant case, accepting, *arguendo*, plaintiff's characterization of the transaction as a "purchase" and subsequent "sale," there was no span of time between the "purchase" and "sale" in which the market could fluctuate and which could be exploited by any of the defendant insiders in the .form of short-swing profits. Such

transactions thus do not create an opportunity for "the realization of short-swing profits based upon access to insider information," the evil to which 16(b) was attuned. *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594–95, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973).

Another factor which would raise the specter of possible speculative abuse with respect to transactions such as the ones presently before the Court is the possession by the insider of "some measure of influence over the timing and circumstances of the transaction sufficient to give [the insider] the possibility of profits *based on* inside information." *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631, 640 (S.D.N.Y.1974) (Lasker, J.) (emphasis in original). This ingredient is absent here, as plaintiff nowhere contests the fact that Whitmore, Drisler and Lear had absolutely no control over the making of the offer or the date at which the option was to be appraised. That Drisler, Lear and Whitmore were able to determine the probable valuation dates prior to accepting the proposals does not lend sufficient possibility of abuse to these option "buy-outs" to bring such transactions within the ambit of § 16(b).

Viewing these transactions in another light reveals that, in selling their option rights, Whitmore, Lear and Drisler realized profits that inured to them as long-term holders of the options, not as insiders taking a short-term speculative position.[10] If any-

---

**10.** This theory is recognized by 17 C.F.R. § 240.16b–6, which exempts from 16(b) treatment the long-term aspect of profits resulting from *sales within six months of the exercise of* a stock option.

Reg. § 240.16b–6. (a) To the extent specified in paragraph (b) of this rule, the Commission hereby exempts as not comprehended within the purposes of Section 16(b) of the Act any transaction or transactions involving the purchase and sale, or sale and purchase, *of any equity security where such purchase is pursuant to the exercise of an option or similar right either* (1) acquired more than six months before its exercise, or (2) acquired pursuant to the terms of an employment contract entered into more than six months before its exercise.

(b) In respect of transactions specified in paragraph (a) the profits inuring to the issuer

shall not exceed the difference between the proceeds of sale and the lowest market price of any security of the same class within six months before or after the date of sale. Nothing in this rule shall be deemed to enlarge the amount of profit which would inure to the issuer in the absence of this rule.

(c) The Commission also hereby exempts, as not comprehended within the purposes of Section 16(b) of the Act, the disposition of a security, purchased in a transaction specified in paragraph (a), pursuant to a plan or agreement for merger or consolidation, or reclassification of the issuers' securities, or for the exchange of its securities for the securities of another person which has acquired its assets, or which is in control as defined in Section 368(c) of the Internal Revenue Code of 1954, of a person which has acquired its assets, where the terms of such plan or agreement are binding upon all stockholders of the is-

thing, they took advantage of Indian Head's desire to remove from their hands the ability to acquire substantial amounts of voting stock, and not of an opportunity afforded them as insiders to realize profit or avoid loss through a short-term swing in investment position, the abuse sought to be controlled by 16(b).

The Court also finds the fact that neither Whitmore, Drisler nor Lear had to take a risk in order to reap the substantial benefits received insufficient to warrant imposition of 16(b) liability. This "risk free" position was likewise a function of the fact that they had held the options for a substantial period of time as well as of the fact that a restructuring of their relationship with the company was desired.

In sum, the Court finds that Indian Head's purchases of the stock option rights held by Drisler, Lear and Whitmore were not transactions of the type which fall within the per se rule of Section 16(b).

*The Fraud Claims*

■ In this derivative suit plaintiff also alleges that defendants violated Sections 10(b) and 14 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n, and Rule 10b–5 promulgated thereunder by causing Indian Head to purchase certain stock option rights from defendants Drisler, Lear and Whitmore in direct contravention of the plans under which the options were granted. In connection with these allegations this Court follows the well reasoned opinion in *Garwin v. Cox*, No. 72–1220 (S.D. N.Y. October 23, 1973) (Metzner, J.), decided on facts almost identical to those herein, and finds the absence of some form of deception or nondisclosure that has caused injury to the corporation to be fatal to plaintiff's fraud claim. The fraud alleged

by plaintiff regarding the 1971 proxy statement does not supply such fraud or nondisclosure in that those proxy statements did not solicit any shareholder votes in connection with the challenged transactions.

## CONCLUSION

Plaintiff's own statement of the major issue involved herein presages the result. He asserts: "Defendants' 'stock option buyout' or 'cancellation of option' device is structured to permit an insider with availability to inside information to exercise his option and *instantaneously* receive his profits without having to expend a dollar in cost." Plaintiff's Memorandum in support of his motion for summary judgment and in opposition to defendants' motion to dismiss, at 54 (emphasis added). That Drisler, Lear and Whitmore each profited from a single *instantaneous* transaction is precisely the point. The "buy-outs" presented no opportunity for speculation, and none was involved.

Thus, on the uncontradicted facts before the Court, plaintiff has failed to prove a violation of Section 16(b) of the Securities Exchange Act of 1934. Moreover, absent proof of any deception or nondisclosure with respect to the alleged violation of various of Indian Head's option plans, plaintiff's fraud claims likewise fail.

Accordingly, summary judgment is hereby granted dismissing plaintiff's complaint as against defendants William Drisler, Edward Whitmore, Robert Lear, Richard Powers and John O'Sullivan.

SO ORDERED.

suer except to the extent that dissenting stockholders may be entitled, under statutory provisions or provisions contained in the certificate of incorporation, to receive the appraised or fair value of their holdings.

(d) The exemptions provided by this rule shall not apply to any transaction made unlawful by Section 16(c) of the Act or by any rules and regulations thereunder.

(e) The burden of establishing market price of a security for the purpose of this rule shall rest upon the person claiming the exemption.

(f) The exemption granted pursuant to this rule shall apply to any liability under Section 16(b) existing at or after the effective date of this rule, but shall not be deemed to affect judgments rendered prior to that date.