**Leo P. PORTNOY, Plaintiff,**

v.

**SELIGMAN & LATZ, INC., a Delaware Corporation, Sidney Singer, Sidney Singer, Jr., and Stephen L. Singer, Defendants.**

**No. 78 Civ. 4632 (CHT).**

United States District Court,
S. D. New York.

June 23, 1981.

William Goldstein, New York City, for plaintiff.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendants; Richard L. Bond, Joseph H. Adams, New York City, of counsel.

## OPINION

TENNEY, District Judge.

The plaintiff, Leo Portnoy, charges the defendants with violations of section 16(b) of the Securities Exchange Act of 1934 (the "Act"), which prohibits corporate insiders from retaining any profits realized on short-swing investments in their company's securities. 15 U.S.C. § 78p(b). Portnoy urges the Court to disgorge the defendants' profits on a singular sale of stock warrants. Whether his complaint is viewed under the objective or pragmatic approach to section 16(b), the defendants are entitled to summary judgment.

*Background*

The defendants, Sidney Singer, Sidney Singer, Jr., and Stephen L. Singer, were directors and officers of Seligman & Latz ("S&L"), and they held warrants in S&L common stock. In connection with a public offering, several underwriters purchased a large block of warrants from the Singers.[1] These warrants were then exercised by the underwriters, who used the stock as part of the offering. From the sale of warrants, the Singers received the substantial consideration of $11.57 per warrant. (This price was arrived at by starting with the intended public offering price of $18.75, subtracting the exercise price of $5.88, and then subtracting the underwriter's discount of $1.30). The plaintiff argues that the price received for the warrants should be disgorged. He does not attempt to pair the sale of warrants with their original acquisition which was clearly more than six

---

1. The defendants also sold shares to the underwriters, but the plaintiff apparently does not question the legality of these sales of shares by the defendants. Portnoy's complaint is unclear on the point. (Paragraph 6 states that the Singers sold 170,000 warrants to the underwriters, whereas paragraph 7 states that the defendants sold "approximately 278,000 shares" of S&L stock.) But the affidavit submitted by the plaintiff in opposition to the defendants' motion and in support of its cross-motion focuses only on the sale of warrants, as does the accompanying memorandum. Affidavit of William Goldstein, sworn to April 21, 1981 ("Goldstein Aff."); Memorandum of Law in Support of Plaintiff's Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Memorandum of Law").

months before their sale. Instead, he challenges the Singers' realization of a market premium on their warrants through the use of underwriters. The crux of Portnoy's complaint is contained in the following paragraphs:

6. On or about April 22, 1976, said individual defendants [the Singer Group] purchased approximately 170,000 shares of "SL" stock at the price of $5.876 per share upon the exercise by the Underwriters . . . , as agents for the individual defendants, of warrants to purchase 182,-610 shares of "SL" common stock (170,000 of such warrants were owned by the individual defendants) to consummate a "secondary offering" of "SL" shares to the public on April 22, 1976.

7. Less than six months later, on or about April 22, 1976, said individual defendants sold approximately 278,000 shares of "SL" stock at the price of $18.75 per share, resulting in a net profit to them of approximately $1,970,000.00.

Complaint ¶¶ 6, 7.

The defendants respond that "[t]hese allegations are contrary to fact in every essential respect." Affidavit of Sidney Singer, Jr., sworn to February 19, 1981 ("Singer Aff."), ¶ 15. The terms and conditions of the underwriters' purchases were set forth in an underwriting agreement. Exh. A to Singer Aff.

These purchases were made pursuant to what is known as a "firm commitment," whereby the underwriters "assumed all economic risks arising from . . . ownership" of the securities, and the sellers "ceased to have any interest in the Stocks and Warrants sold." Singer Aff. ¶¶ 4, 5.

The essential feature of such an underwriting is that an underwriting syndicate purchases securities for the accounts of individual underwriters who, as of the effective date of the underwriting agreement, bear the risk of possible financial loss arising from the subsequent offering of the securities to the public.

Affidavit of Richard L. Bond, sworn to February 20, 1981 ("Bond. Aff."), ¶ 3. Because of this, the defendants assert:

The "firm commitment" purchase . . . precludes any good faith contention that the Underwriters acted as mere "agents" for the Singer Group. Instead, . . . the Underwriting Agreement [Exh. A to Singer Aff.] establishes that the Underwriters became the exclusive beneficial owners of the Warrants and Stock sold to them. Indeed, the Underwriters were required to certify that they were *bona fide* purchasers of the Stocks and Warrants acquired by them. (See Exhibit "H" annexed hereto.)

Singer Aff. ¶ 16.

In support of their motion for summary judgment, the defendants submitted several affidavits and a statement pursuant to this Court's Local Civil Rule 3(g), stating that there is no genuine issue as to the material facts of this case. In response, the plaintiff has not submitted any "separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Rule 3(g) provides that the material facts alleged in the movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." These facts are as follows: (1) that the Singer Group sold their warrants; (2) that they did not exercise their warrants; (3) that the underwriters did exercise the warrants and subsequently sold the stock to the public; and (4) that the Singer Group did not purchase or sell any of the stock involved. But even without taking these facts as admitted, the Court finds that this case is ready for summary judgment. The plaintiff, who has cross-moved for summary judgment, does not appear to suggest that the material facts are in dispute. Indeed, in a prior memorandum of law in connection with an unrelated motion, plaintiff's counsel made the following statements:

Plaintiff concludes that there really are no complex factual issues whatsoever in this case and that this Honorable Court is only requested to furnish its legal conclusion as to the ramification of these transactions on behalf of SIDNEY SINGER, SIDNEY SINGER, JR., and STEPHEN L. SINGER.

\* \* \* \* \* \*

[P]laintiff's counsel was able to resolve virtually all factual issues through a trip to the SEC Reference Room located in this Courthouse. What could be easier access than this? For defendants to ignore the compelling conclusion that there are no material factual issues in PORTNOY is to adopt a struthious-like posture to the obvious. PORTNOY ultimately involves the rendering by this Court of its judgment as to the legal effect of these transaction[s] consummated by the individual defendants. To think that a trial or live testimony is necessary in Portnoy is to engage in a comic book fantasy to the nth degree.

Quoted in Bond Aff. ¶ 8. Accordingly, the Court will proceed to assess the propriety of the defendants' transactions.

*Discussion*

Section 16(b) provides, in pertinent part, that an insider must surrender to the issuing corporation "any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period less than six months." 15 U.S.C. § 78p(b). The statute defines an insider as a "beneficial owner [of more than 10% of any class of securities], director, or officer." *Id.* The defendants in this case have acknowledged that, at the time of the transactions in question, Sidney Singer was a director of S&L and that Stephen Singer and Sidney Singer, Jr., were officers and directors of the company.

Section 16(b) states in its introductory clause that it was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by [an insider] ... by reason of his relationship to the issuer." 15 U.S.C. § 78p(b). As initially interpreted by the courts, however, this policy statement was not understood as establishing a flexible standard of liability for those who "may have" had access to information. The Second Circuit stated in *Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir.), *cert. denied*, 320 U.S. 751, 64 S.Ct. 46, 88 L.Ed. 446 (1943):

Had Congress intended that only profits from actual misuse of inside information should be recoverable, it would have been simple enough to say so. Significantly, however, it makes recoverable the profit from any purchase and sale, or sale and purchase, within the period. The failure to limit the recovery to profits gained from misuse of information justifies the conclusion that the preamble was inserted for other purposes than as a restriction on the scope of the Act.

*Id.* at 236 (footnotes omitted); *Tyco Laboratories, Inc. v. Cutler-Hammer, Inc.*, 490 F.Supp. 1, 5–6 (S.D.N.Y.1980). On this point, Justice Douglas suggested that the preamble "was intended to aid in establishing the constitutionality of the section and guiding the Commission's rulemaking authority." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 611 n.11, 93 S.Ct. 1736, 1753 n.11, 36 L.Ed.2d 503 (1973) (Douglas, J., dissenting).

Instead of adopting a flexible standard, Congress designed a "flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972). As the Supreme Court explained:

"In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure optimum prophylactic effect."

*Id., quoting Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). The law's drafters recognized that they were adopting a "crude rule of thumb," Hearings Before Senate Committee on Banking & Currency, 73d Cong., 2d Sess. 6557 (1934). But this "arbitrary, some

might say Draconian," statute was viewed as the only effective way to combat the problem of the unfair use of insider information. *Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967). "It might be said that Congress decided in order to throw out the bathwater that the baby had to go too." *Id.*

On the other hand, courts have been careful not to throw out too much bath water.[2] Throughout the history of section 16(b), courts have been uncomfortable with the rule's rigid terms and with its underlying assumptions. Accordingly, they have differed markedly on how to apply the law. A brief sampling of Second Circuit cases aptly illustrates the vacillation of judicial views on section 16(b). Early opinions adopted a rigorous, objective approach. *Smolowe v. Delendo Corp., supra*, 136 F.2d at 235 ("It is apparent . . . from the language of § 16(b) itself, as well as from the Congressional hearings, that the only remedy which its framers deemed effective . . . was the imposition of a liability based upon an objective measure of proof"; involving straight purchases and sales within six-month period). In *Park & Tilford, Inc. v. Schulte*, 160 F.2d 984 (2d Cir. 1947), the court held that a conversion of preferred stock into common stock constituted a "purchase," even though the conversion was made after the corporation had served a notice of redemption on the preferred shareholders. By selling their common stock within six months of the conversion, the insiders took advantage of "a spectacular rise in the market price of . . . [the] common stock, probably [due to] the rumor of an impending dividend to be paid in liquor." *Id.* at 986. In refusing to exclude the stock conversion from the literal reach of 15 U.S.C. § 78c(a)(13), defining "purchase," the court observed simply: "Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act." *Id.* at 987.

Subsequent cases, however, have limited the breadth of *Park & Tilford* by noting that there the insiders used their positions to force the issuance of a notice of redemption of the preferred stock. Rejecting "intimations to the contrary," the court in *Blau v. Lamb, supra*, stated that "our court appears always to have recognized that in deciding whether a certain transaction is a Section 16(b) 'purchase' or 'sale' it is relevant to first consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent." 363 F.2d at 518. *See also Roberts v. Eaton*, 212 F.2d 82, 86 (2d Cir.), *cert. denied*, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954) (The "cumulative effect" of several factors indicates that the "reclassification at bar could not possibly lend itself to the speculation encompassed by § 16(b)."; *Shaw v. Dreyfus*, 172 F.2d 140 (2d Cir.), *cert. denied*, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949) (gifts gave insider no profit); *Lewis v. Adler*, 331 F.Supp. 1258 (S.D.N.Y.1971) (same); *Truncale v. Blumberg*, 80 F.Supp. 387 (S.D.N.Y.1948)

2. For example, courts have written: "It is an objective rule and does not reach every transaction in which an [insider] actually relies on inside information, or in which the potential for such reliance is great." *Lewis v. Varnes*, 505 F.2d 785, 787 (2d Cir. 1974). "Thus, it is consistent with the statutory scheme to permit an insider to 'plan' a sale within the six-month period that will not take place until after six months have passed from a matching purchase," *Reliance Elec. Co. v. Emerson Elec. Co., supra*, 404 U.S. at 442, 92 S.Ct. at 609 (Douglas, J., dissenting). On the other hand, although "[s]ection 16(b) . . . allows some to escape who have abused their inside information[,] [i]t should not be surprising, given· the objective nature of the rule, if some are caught

unwillingly." *Kern County Land Co. v. Occidental Petroleum Corp., supra*, 411 U.S. at 613, 93 S.Ct. at 1753 (Douglas, J., dissenting). Just as Congress found the potential for abuse of insider information is greatest in the class of transactions covered by the statute, the risk of abuse is presumed to have dissipated in those transactions falling outside the scope of the law. *Id.* at 603, 93 S.Ct. at 1748. "In short, the statute imposes liability without fault [but only] within its narrowly drawn limits." *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976); "Exceptions to Liability Under Section 16(b): A Systematic Approach," 87 Yale L.J. 1430, 1432–33 & n.12 (1978) (hereinafter cited as "Exceptions to Liability").

(same). *But see Heli-Coil Corp. v. Webster*, 352 F.2d 156, 167 (3d Cir. 1965) (en banc) (following *Park & Tilford's* objective test on conversions).

In more recent cases, the Second Circuit has gone so far as to note that "[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with the legislative purpose." *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 262 (2d Cir. 1969), *cert. denied*, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970) (defendant corporation was an insider of the issuing corporation on the theory that an individual sitting on both boards had been "deputized" by defendant Martin Marietta). "The courts, however, are free to adopt such a flexible approach in construing § 16(b) only in those cases where the relevant provision is either intrinsically ambiguous or in which there are alternative plausible applications of the provision to a particular factual situation." *Lewis v. Varnes, supra*, 505 F.2d at 789, *citing Kern County Land Co. v. Occidental Petroleum Corp., supra*, 411 U.S. at 594, 93 S.Ct. at 1744. To resolve ambiguities, the courts now look as a matter of course to the statute's preamble for guidance in apparent contradiction of the language in *Smolowe v. Delendo Corp., supra*, which stated that the preamble was not intended to be read as a flexible standard of liability. *See, e. g., Newmark v. RKO General, Inc.*, 425 F.2d 348, 353–54 (2d Cir.), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970) ("The significant factor is whether RKO *could have* reaped speculative profit from the 'unfair use of information * * * obtained * * by reason of [its] relationship to [Central].' Securities Exchange Act of 1934, § 16(b)" (emphasis in original); defendant corporation's purchase of another corporation's shares, in anticipation of the issuer's imminent merger with an RKO subsidiary, "placed RKO in a position which must be the dream of every speculator—"Heads I win, tails I do not lose.'").

The evolution of the Second Circuit's jurisprudence on section 16(b) is consistent with the inconsistent development of law in this area throughout the federal courts. *See generally* Hazen, "New Pragmatism Under Section 16(b) of the Securities Exchange Act," 54 N.C.L.Rev. 1 (1975). Indeed, mirroring and reinforcing the confusion in the lower courts, the Supreme Court's opinions have gone along with "the greater weight of authority . . . to the effect that a 'pragmatic' approach to § 16(b) will best serve the statutory goals." *Kern County Land Co. v. Occidental Petroleum Corp., supra*, 411 U.S. at 594 n.26, 93 S.Ct. at 1744 n.26. A pragmatic approach to the statute's purposes will sometimes mean enforcing the law's limitations very strictly, *e. g., Foremost-McKesson, Inc. v. Provident Securities Co., supra* (investor is not considered a 10% beneficial owner until *after* the purchase which puts his holdings over 10%); *Reliance Elec. Co. v. Emerson Elec. Co., supra* (13.2% owner had to disgorge profits from first sale of 3.24%, but not from sale of remaining 9.96%, because of proviso that the "subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale." 15 U.S.C. § 78p(b).).[3] At other times, however, a pragmatic approach requires the court to explore beneath the surface to explain why a transaction within the literal terms of the statute should not be treated as one. For example, in *Kern County Land Co. v. Occidental Petroleum Corp., supra*, the defendant Occidental was a disappointed tender offeror whose bid to take over Kern was defeated by a counteroffer from Tenneco, Inc. In the course of the Kern-Tenneco merger, Occidental exchanged its shares of Kern stock for shares of Tenneco and gave Tenneco an option, exercisable six months after Occidental's last purchase of Kern stock, to buy out Occidental's holdings in Tenneco. Even though the option fell within the statutory definition of "sale," 15 U.S.C. § 78c(a)(14), and the option was sure

---

**3.** It is interesting to note that the American Law Institute's Proposed Federal Securities Code would overrule the Supreme Court's holdings in *Reliance Electric* and *Foremost-McKesson*. ALI, Proposed Federal Securities Code (1978) § 1714, Note (2).

to be exercised, the Supreme Court ruled that Occidental could keep the profit realized on its short-term investment.

In reaching that decision, the Court suggested several factors to consider in deciding whether the purposes of section 16(b) would be served by disgorging profits in a given case: access to inside information, the voluntariness of the transaction, and the possibility of speculative abuse. Although these factors were not presented as elements of a legal standard, they were highlighted in the Court's description of the transaction and in the Court's impressions of the circumstances. For example, the Court stated: "[W]e think it totally unrealistic to assume or infer from the facts before us that Occidental either had or was likely to have access to inside information . . . so as to afford it an opportunity to reap speculative, short-swing profits." *Kern County Land Co. v. Occidental Petroleum Corp., supra*, 411 U.S. at 596, 93 S.Ct. at 1745. Furthermore, "the involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that § 16(b) should not apply to transactions such as this one." *Id.* at 600, 93 S.Ct. at 1747. "And we do not find in the execution of the Occidental-Tenneco option agreement a sufficient possibility for the speculative abuse of inside information . . . to warrant holding that the option agreement was a 'sale' within the meaning of § 16(b)." *Id.* at 601, 93 S.Ct. at 1748. Occidental wanted to avoid making a large investment in a minority position; Tenneco wanted to avoid having a potentially troublesome minority shareholder. "Motivations like these do not smack of insider trading." *Id.*

Without providing clear direction, these observations force lower courts to delve ever more deeply into the specific facts of each case. *See generally* Note, "Insider Liability for Short-Swing Profits: The Substance and Function of the Pragmatic Approach," 72 Mich.L.Rev. 592, 620–27 (1974). Moreover, because of the variety of statements in *Kern County*, lower courts cannot be certain how to evaluate the factors mentioned in relation to one another. "The Court did not specify which findings . . . are necessary, and which sufficient, to yield the conclusion that a given transaction lies outside the purview of section 16(b)." "Exceptions to Liability," *supra*, 87 Yale L.J. at 1436.

The case of *Gold v. Sloan*, 486 F.2d 340 (4th Cir. 1973), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), exemplifies the flexibility, unpredictability, and general confusion in this area of the law. There, the Fourth Circuit exonerated two officers who earned short-swing profits after a merger, while requiring a third officer to disgorge profits from the same transaction. The two officers allowed to keep their profits were described as "in the lower management hierarchy. Neither had the slightest connection with the merger negotiations . . . and [both] were as ignorant of merger developments as any outside stockholder." 486 F.2d at 351. In addition, the court found that one defendant's listing as an "officer" was "purely 'titular' and not real." *Id.* The third defendant, however, was the company's chief executive officer who was intimately involved with the merger discussions. The key distinction between him and the other defendants, under section 16(b), was that he "possessed specific financial information" about the merger, which "knowledge is the source of his 'possibility of speculative abuse.'" *Id.* at 351–53. All of these findings are convincingly supported in the opinion. But by reviewing the circumstances in such exhaustive detail, the Fourth Circuit demonstrated the difficulty faced by all lower courts, as well as the distance we have come from an easily applied, bright-line test of insiders' liability. *See* 5 L. Loss, Securities Regulation 3029–40 (2d ed. Supp.1969) (describing the "generalizing-defying nature" of the cases in this area).

The Supreme Court cautions that, despite the extreme breadth of the terms "purchase" and "sale," they should not be applied to "transactions not ordinarily deemed a sale or purchase" unless "the transaction may serve as a vehicle for the evil which

Congress sought to prevent—the realization of short-swing profits based upon access to insider information." *Kern County Land Co. v. Occidental Petroleum Corp., supra,* 411 U.S. at 594, 93 S.Ct. at 1744; *Reliance Elec. Co. v. Emerson Elec. Co., supra,* 404 U.S. at 424 & n.24, 92 S.Ct. at 600 & n.24. In other words, to judge whether section 16(b) means what it says, a court must first ask whether the statute, in light of its purposes, should mean what it says.

To reduce the application of this tricky test, it has usually been restricted to "unorthodox" transactions, a term attributed to Professor Loss, who said that the category would include stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants. 2 Securities Regulation, *supra,* at 1069 (2d ed. 1961); *Kern County Land Co. v. Occidental Petroleum Corp., supra,* 411 U.S. at 593 n.24, 93 S.Ct. at 1744 n.24. But deciding whether a transaction is "unorthodox" often simply begs the question of whether section 16(b) applies. Note, "Involuntariness and Other Contemporary Problems Under Section 16(b) of the Securities and Exchange Act of 1934," 27 Hastings L.J. 679, 686–88 (1976). As a result, courts frequently apply both the objective and pragmatic approaches in cases under this provision. *E. g., Tyco Laboratories, Inc. v. Cutler-Hammer, Inc., supra.*

*Defendants' Sale of Warrants.*—Viewed "objectively," the defendants' sale of their warrants clearly constituted a "sale" of an "equity security." The statute defines "sale" as "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(14). "Equity security" is defined as "any stock or similar security . . . or any such warrant or right [to subscribe to or purchase a security]." 15 U.S.C. § 78c(a)(11). With considerable force, however, the defendants argue that this case involves only one transaction attributable to them and that this transaction was only a sale of warrants, not an exercise of warrants followed by a profit taking. Defendants' Reply Memorandum at 6–11.

This distinction is supported, first, by common sense and, second, by cases and commentaries. Despite the plaintiff's outraged cries about "clever, cute, and sophisticated devices" which "lawyers, accountants and assorted financial 'wizards' devise in attempts to avoid the strictures of the securities laws," Goldstein Aff. ¶¶ 4, 6, the Court is unwilling to disregard form in assessing the defendants' actions. As the Supreme Court explained: "Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." *Reliance Elec. Co. v. Emerson Elec. Co., supra,* 404 U.S. at 422, 92 S.Ct. at 599.

The fact that warrants for large blocks of stock carry a substantial premium, which grows over the years, is not surprising. Indeed, the value of warrants, a value locked in because of the contractual exercise price, also makes them valuable "as a coin with which corporations might attract able personnel and stimulate their efforts." *Truncale v. Blumberg,* 88 F.Supp. 677, 679 (S.D.N.Y.), *aff'd on opinion below,* 182 F.2d 1021 (2d Cir. 1950). When these transferable warrants are sold, their holders' profits probably derive from the warrants' locked-in value, not necessarily from speculative abuse. The buyer of the warrants may want to assure himself that the insider is not trading on undisclosed material information, a wrongful act covered elsewhere in the securities laws. But a singular sale does not raise the specter of *short-swing* abuse covered by section 16(b).

This conclusion is supported by the cases which have dealt with warrants under section 16(b). All of them distinguish between outright sales of the warrants and exercises of warrants followed by sales. *Morales v. Mapco, Inc.,* 541 F.2d 233 (10th Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 768, 50 L.Ed.2d 770 (1977); *Shaw v. Dreyfus, supra; Truncale v. Blumberg, supra. See Silverman v. Landa,* 306 F.2d 422 (2d Cir. 1962) (distinguishing between sale and exercise of options). *See also* Com-

ment, "Corporations—The Exercise of Warrants Constitutes a Purchase Under Section 16(b)," 43 Mo.L.Rev. 125, 131 (1978). Moreover, Professor Loss wrote, in discussing the measure of recovery for an exercise of warrants and a resale of the shares within six months: "If the warrants, instead of being *exercised*, were *sold* more than six months after their issuance, there would be no liability on any theory." 2 Securities Regulation, *supra*, at 1080 (emphasis in original). (This treatise, however, was written before the onset of the pragmatic approach, which necessitates further discussion of the difference between the exercise and sale of warrants. See below.) In short, an objective approach leads to the conclusion that the Singers' sale of their warrants, standing alone, is not subject to section 16(b).

*Underwriters as Agents.*—The plaintiff, however, alleges that "the individual defendants made use of underwriters as a conduit in the effort to conceal what would otherwise have been an illegal transaction under Section 16(b)." Goldstein Aff. ¶ 2. Because the underwriters' speedy exercise of the warrants and resale of the shares were exempt from section 16(b) under the SEC's Rule 16b–2, 17 C.F.R. § 240.16b–2 (1978), the defendants employed the underwriters as "agents" in the scheme to reap short-swing profits. Complaint ¶ 6.

■ The Court rejects this contention out of hand. There has been no evidence alleged and no proof suggested which would substantiate an agency relationship between the underwriters and the individual defendants. Indeed, all of the objective proof, which has not been contested except to impugn heinous motives, points in the opposite direction. The underwriters made a "firm commitment" to sell the stock they purchased by exercising the warrants. As explained by the defendants' attorney, this meant that the underwriters assumed full financial responsibility for those shares. They reaped all the proceeds from the public sale; they accepted the risk of keeping shares if the market could not absorb all the shares offered; and they paid the individual defendants, in full, with bank drafts,

before the success of the stock offering was known.

The plaintiff derides the defendants' references to the firm commitment as "nothing more than an apologia[. . . . The] firm commitment was little more than an additional attempt to avoid the imposition of liability for these illegal transactions." Goldstein Aff. ¶ 5. If the parties' arrangement was nothing more than an apologia, it was surely an expensive and risky one for the underwriters, since they were contractually obligated to pay for the warrants regardless of the stock's resaleability. The Court rejects the plaintiff's unsupported arguments and finds that the underwriters were not agents of the Singers. This was the same conclusion reached in two similar cases brought by this plaintiff in other district courts. *Portnoy v. Texas Int'l Airlines, Inc.*, No. 79 C 1600 (E.D.Ill. Dec. 5, 1980); *Portnoy v. Memorex Corp.*, No. C–79–0463 (SW) (N.D.Cal. Sept. 28, 1979). (Copies of these opinions are attached to the Bond Aff. as Exhs. A and B, respectively.) Indeed, even the plaintiff's counsel wrote, in a memorandum unrelated to this motion: "[T]he plaintiff now concedes . . . that the underwriters were not acting as agents for the individual defendants." Bond Aff. ¶ 8.

*Single-Transaction Liability.*—There remains only one theory on which the defendants could be held liable—that is, if the statute reaches single-transaction violations if a single transfer has the same effect as double-transaction violations. *See generally* "Insider Liability for Short-Swing Profits: The Substance and Function of the Pragmatic Approach," *supra*, 72 Mich.L. Rev. at 598–610. Following the pragmatic approach, the Court may consider the practical effect of the defendants' acts. But even with the latitude of the pragmatic approach, the defendants' sale of their warrants for a premium does not violate section 16(b).

Because the Singers' sale of their warrants was a cash-for-securities transaction within the meaning of section 16(b), it does not fit the mold of an "unorthodox" arrangement. As pointed out in a slightly different setting,

no case either before or after *Kern County* has exempted cash-for-stock transactions from the automatic application of section 16(b) and, with a single exception, every case holding a transaction to be "unorthodox", and thus exempt from the "automatic" application of section 16(b), has involved a "conversion."

*Tyco Laboratories, Inc. v. Cutler-Hammer, Inc., supra,* 490 F.Supp. at 6–7 (footnotes omitted); *American Standard, Inc. v. Crane Co., supra,* 510 F.2d at 1060 (escape from "automatic ban" of statute has "thus far been limited to situations where there has been a 'conversion' of securities rather than a purchase or sale for cash"). The term "conversion" has come to represent a narrow range of transactions: exchanges of stock pursuant to merger agreements, e. g., *American Standard, Inc. v. Crane Co., supra;* transfers pursuant to recapitalization, *Rothenberg v. United Brands Co.,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,045 (S.D.N.Y.), *aff'd without opinion,* 573 F.2d 1295 (2d Cir. 1977); exercise of stock options or stock appreciation rights, *Matas v. Siess,* 467 F.Supp. 217 (S.D.N.Y. 1979) (stock appreciation rights); *Freedman v. Barrow,* 427 F.Supp. 1129 (S.D.N.Y.1976) (same); *Makofsky v. Ultra Dynamics Corp.,* 383 F.Supp. 631 (S.D.N.Y.1974) (option); and other unusual transactions, e. g., *Heit v. Katz,* [1978 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,405 (S.D.N.Y.1978) (equivalent of call option); *Rosen v. Drisler,* 421 F.Supp. 1282 (S.D.N.Y.1976) (cancellation of stock option).

But putting aside, for the moment, the differences between the Singers' transactions and other transactions considered "unorthodox," the Court will proceed to discuss the analogous area of stock appreciation rights, where courts have split on whether a single transaction can violate the statute if it can be viewed as the equivalent of two transactions. Stock appreciation rights are a form of executive compensation which allow the holder, upon their exercise, to receive either cash or securities representing the spread between a fixed stock price and the prevailing market price. Often, stock appreciation rights are granted along with a stock option, giving the holder the opportunity to reap the benefits of the option without having to arrange and finance the purchase of all the shares offered. *See generally* Herzel & Perlman, "Stock Appreciation Rights," 33 Bus. Law 749 (1978). In *Freedman v. Barrow, supra,* the court refused to view the defendants' exercise of their appreciation rights as a dual transaction—namely, a purchase of stock and a sale of the option back to the company. "Merely because the net result to the employee is the same ... does not mean that other transactions have in fact occurred." 427 F.Supp. at 1152. The court went on to describe the factual differences between single and double transactions, and to explain its conclusion that insider abuse was not a significant risk in these circumstances. Among other things, because the defendants received stock instead of cash upon exercising their appreciation rights, "[t]hey could not and did not eliminate the down-side risk." 427 F.Supp. at 1153. In other words, although the insiders did reap profits in a form which minimized their exposure to decreases in the market price, they were still vulnerable to market changes during the six months in which they could not resell their stock. Apparently, a complete cash-out, executed in one transaction, might raise greater problems under the statute. *Id.;* Herzel & Perlman, "Stock Appreciation Rights," *supra,* 33 Bus. Law at 766.

In a similar case, *Rosen v. Drisler, supra,* the court refused to apply section 16(b) to several officers' sales of their stock options back to the issuer who wanted to cancel them. While acknowledging the wisdom of considering "the substance of the transaction rather than its form," the court refused to find that the insiders had, in effect, exercised the options and sold them simultaneously. 421 F.Supp. at 1285. As support for its findings, the court pointed out that there was no pairing of transfers which would have allowed the defendants to take advantage of short-term market fluctuations; that the defendants had no " 'measure of influence over the timing and

circumstances ... sufficient to give [them] the possibility of profits *based on* inside information,'" *id.* at 1287, *quoting Makofsky v. Ultra Dynamics Corp., supra,* 383 F.Supp. at 640 (emphasis in original); and that the defendants' profits "inured to them as long-term holders of the options, not as insiders taking a short-term speculative position." 421 F.Supp. at 1287.

In a third case, the court found that the exercise of stock appreciation rights for cash amounted to a "simultaneous purchase and sale." *Matas v. Siess, supra.* The court interpreted the exercise as a "purchase," and called the receipt of cash profits "plainly a sale," 427 F.Supp. at 224. The court emphatically stated: "Why a wholly voluntary simultaneous purchase and sale, *with the possibility of speculative abuse,* should be exempted and found outside the statute has not been satisfactorily explained." *Id.* at 224 (emphasis in original).

Having found that the exercise of appreciation rights satisfied the "purchase" and "sale" requirements, the court next discussed why it found a possibility of speculative abuse. One after another, the contrary precedents were distinguished. Unlike the *Matas* insiders' unfettered discretion to cash out, the defendants in *Rosen v. Drisler* "had absolutely no control over the making of the offer or the date at which the option was to be appraised." *Rosen v. Drisler, supra,* 421 F.Supp. at 1287. Indeed, the defendants were able to realize a cash profit only because of the company's "desire to remove from their hands the ability to acquire substantial amounts of voting stock." *Id.* at 1288. And in *Freedman v. Barrow,* although the defendants could decide when to exercise their appreciation rights, the issuing company retained the right to determine whether the insiders were paid in cash or securities. Because securities had been used in each instance presented, the insiders became "locked into an investment position for at least six months." *Matas v. Siess, supra,* 467 F.Supp. at 223. In contrast, the *Matas* court found that

> where stock appreciation rights are exercisable for cash, the possibility for specu-

lative abuse clearly exists. The officer or director is in a position ... to reap a profit which he speculates may not be realizable a few months hence, based on inside information.

*Id.*

Applying these principles to the case at bar, the court finds that the Singers' sales of warrants did not carry a potential for speculative abuse within the meaning of section 16(b). Concededly, the defendants were "insiders," directors and officers, both before and after the sale of warrants and the subsequent public sale of shares. Furthermore, the warrant sales were clearly voluntary, and the defendants may have controlled the timing of the underwriting deal (although the plaintiff does not make any allegations in this regard). But these facts are not significant in this case. The term "voluntariness," which often appears in 16(b) cases, is not a very helpful standard in this court's opinion. In *Kern County Land Co. v. Occidental Petroleum Corp., supra,* Occidental's sale of Tenneco shares was surely voluntary in the sense that the defeated tender offeror was given a choice, not an ultimatum, to withdraw its investment, plus a handsome profit, after losing the merger battle. What took the case outside section 16(b), according to the Supreme Court, was Occidental's lack of access to inside information. Similarly, the defendants in *Freedman v. Barrow, supra,* and *Rosen v. Drisler, supra,* gave up their options voluntarily—they could have exercised their rights sooner, or waited longer, or exercised their right to purchase the full number of shares covered by their options. Again, what took those cases outside section 16(b) was the absence of a possibility of speculative abuse of inside information. It is to that inquiry that the court now turns.

The defendants in this case sold warrants, which were transferable, to S&L's underwriters who were amassing stock for a large public offering. There is no allegation that the transaction involved a risk of defrauding the underwriters, under section 16(b) or any other provision. Indeed, the plaintiff alleged that the underwriter was

the insiders' agent for avoiding 16(b) liability. Complaint ¶¶ 6–7. Furthermore, the plaintiff does not explicitly argue that warrants and options should be nontransferable, but that would be the effect of adopting its view of this case. There will almost always be some corporate event within six months of a transfer which a disgruntled shareholder could cite as evidence of potential speculative abuse. And if, as plaintiff seems to assert, potential speculative abuse is proved just from the insiders' status as insiders, then no cash transfer could ever be made if the sale of a warrant or option were considered a "purchase" and "sale." When an insider exercises stock appreciation rights which give him a choice between stock and cash, his choice of cash does give rise to a greater potential for speculative abuse than a choice of stock. But when a transferable warrant is sold to an outsider, as the holder is free to do unless contractually restricted, cash is likely to be the only option. Even though a continued stock investment reduces the potential for speculative abuse, *see Matas v. Siess, supra*, 467 F.Supp. at 223; *Freedman v. Barrow, supra*, 421 F.Supp. at 1153, a sale of warrants for cash, where there is no opportunity to take the profits in stock, does not necessarily implicate a potential for speculative abuse that brings the transaction within section 16(b).

In this case, the plaintiff seems to imply that the Singers' sales, made to facilitate the public offering, *must* reflect a possibility of trading on inside information within the comprehension of section 16(b). "After all, the 'insiders'" sale of warrants [was] contemporaneous with the offering made by the underwriters," Plaintiff's Memorandum of Law at 31—as though contemporaneity means that dirty deeds are afoot. In fact, if the shares represented by the warrants were to be of use to the underwriters, the sale of warrants and the public offering had to be contemporaneous. Moreover, the plaintiff's claims about the timing of the transactions sounds more like the predicate

for a claim that the defendant has traded on undisclosed, material inside information, than like a claim of short-swing profits. Indeed, the plaintiff's main assault on the defendants' conduct suggests a unified series of underhanded acts. Portnoy focuses on the close relationship between the underwriters and the Singers, whereby the underwriters as "agents" could garner large profits in a hurry under the protection of the SEC's exemption for securities dealers' short-swing transactions in connection with public sales, 17 C.F.R. § 240.16b–2. But these very allegations about timing and agency weaken the short-swing profits theory. If the plaintiff intended to claim fraud, he should have pursued the "general antifraud statutes that proscribe fraudulent practices. See Securities Act of 1933, § 17(a) ... Today, an investor who can show harm from the misuse of material inside information may have recourse, in particular, to § 10(b) and Rule 10b–5." *Foremost-McKesson, Inc. v. Provident Securities Co., supra*, 423 U.S. at 255, 96 S.Ct. at 521.

By the same token, the plaintiff seems to imply that the mere size of the defendants' profits somehow adds weight to his claim of potential speculative abuse.[4] He urges that "the Court cannot close its eyes to the fact that the Singers achieved a profit of nearly $2,000,000 because someone dreamed up a device of using underwriters as a conduit." Goldstein Aff. ¶ 6. The Court disagrees with the causal connection suggested in that sentence. When a transferable warrant is transferred, the insider's profit is probably attributable to the company's record during the period when the warrant was held, not to insider abuse. *See Rosen v. Drisler, supra*, 421 F.Supp. at 1288; *Truncale v. Blumberg, supra*, 88 F.Supp. at 679. In this case, the fact that the warrants representing large blocks of stock carried a substantial premium because of the underwriters' estimate of the public's acceptance of the offering had nothing to do with access to inside information.

4. Surely the fact that an insider profits does not automatically imply that the short-swing profits provision is applicable. In *Kern Coun-*ty, *supra*, Occidental made a profit of 19 million dollars.

The Court does not mean to suggest that a shareholder must prove the elements of fraud in order to state a claim under section 16(b), but under the pragmatic approach, the Supreme Court has ordered and demonstrated that the actual facts of a transaction figure significantly in determining whether the provision applies. *See, e. g., Kern County Land Co. v. Occidental Petroleum Corp., supra.* Although this development represents a departure from Congress's hope that the section would be administered easily and clearly, with full and fair notice to the insiders affected, the new pragmatic approach also frees the courts to avoid the excesses of the provision's reach in cases where speculative abuse cannot be shown. It is somewhat inconsistent—and perhaps even lazy—for the plaintiff to rest his claim of potential speculative abuse on the general legislative history of section 16(b) and on the fact that insiders tend to have insider information which is a requisite for insider abuse. Portnoy's complaint could have been disposed of quite easily if the statute were applied objectively to the Singers' single transaction. Following the pragmatic approach, however, the Court also considered the possibility that a single transaction, structured to avoid 16(b) liability, actually fell within its scope. But in order for the plaintiff to win, he had to show more than he has shown, which amounts to only a *speculative* potential for speculative abuse of inside information. That is not enough.

■ In this case, apparently with full and appropriate disclosure of their transactions, the defendants sold their transferable warrants to the underwriters, who then assumed the risk and responsibility of selling the shares to the public. The plaintiff's plea for disgorging profits rests upon the doubtful view that all profit taking, which is arranged and consummated within six months, violates the statute, even if the insiders realize their profits in a single, legitimate investment transaction. The Court rejects this view. Even if the pragmatic approach allows us to look beyond form, form is certainly a factor in determining whether there is a potential for specula-tive abuse in connection with short-swing profits. Here, there was no pairing of transactions in this case as there was in other cases. It is the movement of money (or converted equity holdings) into and out of a company's capital reserves which gives rise to the potential for abuse prohibited by the statute. The statute requires a pairing of "purchases" and "sales" to assure that there has been a "span of time . . . in which the market could fluctuate and which could be exploited by . . . the insiders in the form of short-swing profits." *Rosen v. Drisler, supra,* 421 F.Supp. at 1287; *Kern County Land Co. v. Occidental Petroleum Corp., supra,* 411 U.S. at 594–95, 95 S.Ct. at 1744–45. In other words, the fact that the defendants effected only one transaction takes their conduct out of the statute under both the objective and pragmatic approach.

To sum up, the Singers may have realized their profits "shortly" after signing the underwriters agreement, but without a pairing of transactions, their profits cannot be called "swing." And as Duke Ellington said, "It don't mean a thing if it ain't got that swing." Ellington, Edward Kennedy "Duke," "It Don't Mean A Thing If It Ain't Got That Swing" (1932).

Summary judgment is granted for the defendants.

So ordered.