667 F.2d 1281
 Fed. Sec. L. Rep. P 98,466
Leo P. PORTNOY, Plaintiff-Appellant,
v.
MEMOREX CORPORATION, a California corporation; Bank of
America, a National Banking Association; and
Bankamerica Foundation, a non-profit
California corporation,
Defendants-Appellees.
 No. 79-4769.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1981.
Decided Feb. 4, 1982.
 
 R. Barry Churton, Cooper, White & Cooper, San Francisco, Cal., for plaintiff-appellant.
 Robert A. Padway, W. Reece Bader, San Francisco, Cal., argued, for defendants-appellees; Orrick, Herrington & Sutcliffe, San Francisco, Cal., on brief.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY, ANDERSON, and REINHARDT, Circuit Judges.
 DUNIWAY, Circuit Judge:
 
 
 1
 In response to Portnoy's complaint, Bank of America N.T. & S.A. and Bankamerica Foundation moved for summary judgment, which was granted. Portnoy appeals, and we affirm.I. The Question Presented.
 
 
 2
 Portnoy's complaint pleads a derivative claim on behalf of Memorex Corporation, of which he is a shareholder. He claims that the Bank and the Foundation are liable to Memorex under Section 16 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p.
 
 
 3
 Section 16 deals with profits realized by insiders in dealing in equity securities of corporations. It defines insiders, in § 16(a) as:
 
 
 4
 (a) Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 781 of this title, or who is a director or an officer of the issuer of such security, (15 U.S.C. § 78p(a)).
 
 Section 16(b) provides:
 
 5
 (b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, ... of any equity security of such issuer ... within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, ... in entering into such transaction of holding the security purchased or of not repurchasing the security for a period exceeding six months.... This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, ... of the security involved, .... (15 U.S.C. § 78p(b)).
 
 
 6
 The operation of subsection (b) is mechanical. If the insider purchases an equity security of the issuer on January 2, and sells it on June 30, he must turn over his profit to the issuer. On the other hand, if he purchases on January 2 and sells on July 3, he can keep the profit. Similarly, purchase and sale by one who is not a director or officer, within six months, of 9.99% of a class of an equity security does not fall within § 16(b), and such a purchaser-seller can keep his profit. But if the purchase and sale is of 10% or more, he must surrender his entire profit.
 
 
 7
 II. The Transaction Involved.
 
 
 8
 Our problem is simplified by certain assumptions made by the trial judge. For the purpose of deciding the defendants' motion for summary judgment, he assumed that if Portnoy had been allowed to make discovery he could have proved that the Bank officer who served on the Memorex board of directors served also as the deputy of the Foundation and also that the Foundation was the alter ego of the Bank. In other words, the judge assumed that both the Bank and the Foundation were "beneficial owners" and that, by reason of their relationship to Memorex, they were the kind of beneficial owners to which subsection (b) applies.
 
 
 9
 The undisputed facts are these: On August 30, 1974, the Bank acquired from Memorex a warrant to purchase 600,000 shares of Memorex stock at $10 per share. This was done by a purchase agreement and was in connection with a debt previously contracted by Memorex. On April 26, 1978, the Bank made a bona fide donation to the Foundation of a part of that warrant exercisable for 350,000 shares. The Foundation is a non-profit charitable organization under California law. On August 9, 1978, the Foundation sold the warrant to a syndicate of underwriters at a price of $38.75 per share. This was part of a larger transaction in which others also sold warrants to the underwriters and Memorex sold to the underwriters newly issued shares at $48.75 each. The underwriters exercised the warrants and sold the shares to the public at $50.75. The underwriting agreement was for a firm commitment underwriting. The underwriters purchased warrants and stock for their own account as principals. They were not agents of the Bank or of the Foundation. Through this arrangement the Foundation received the same amount of money as it would have if it had itself exercised the warrant and sold the stock. The agreement between the Foundation and the underwriters obliged the latter to exercise the stock warrant immediately upon its receipt. The underwriters could not control the date of exercise of the warrant.
 
 
 10
 III. The Application of the Statute to Portnoy's Complaint.
 
 
 11
 The acquisition of the warrant by the Bank in 1974 was not a "purchase" within the meaning of § 16(b). The warrant was "acquired in good faith in connection with a debt previously contracted" (§ 16(b), supra ). This is not disputed. The transfer of the warrant to the Foundation by the Bank was not a "sale" by the Bank within the meaning of § 16(b). It was a gift, not a sale. The terms "buy" and "purchase" and "sale" and "sell" are broadly defined to include contracts to buy, purchase or otherwise acquire, and contracts to sell or otherwise dispose of. See § 3(a)(13) and (14), 15 U.S.C. § 78c(a)(13) and (14). But these definitions do not include gifts. Moreover, the transfer occurred more than six months (indeed, more than three and one-half years) after the Bank acquired the warrant.
 
 
 12
 The acquisition of the warrant by the Foundation was not a "purchase" by it within the meaning of § 16(b). A donee does not "purchase." Thus the sale of the warrant by the Foundation does not fall within the meaning of § 16(b), even though it occurred within six months of the acquisition of the warrants by the Foundation. This is because there must be a "purchase and sale," or "sale and purchase" to bring § 16(b) into play. There was a sale, but no purchase, of the warrant by the Foundation.
 
 
 13
 Portnoy argues that we should consider the hypothetical situation where the Foundation had itself exercised the warrant and then sold the resulting stock to the underwriters. He says that there would then have been a purchase (the exercise of the warrant), a sale (to the underwriters) within less than six months, a profit, and liability under § 16(b). He then urges that the actual transaction was different in only a formalistic way, so that the same result should obtain.
 
 
 14
 We do not agree. We assume, but do not decide, that the outcome in Portnoy's hypothetical case would be what Portnoy says it would be. But we do not think it would be proper for the courts to recast the actual transaction into Portnoy's hypothetical one in order to create a liability under § 16(b).
 
 
 15
 The fact is that the Foundation did not exercise the warrant, and did not obtain or sell Memorex stock. To exercise the warrant, the Foundation would have had to pay Memorex $3,500,000 for 350,000 shares at $10 per share, thus acquiring 350,000 shares. It did no such thing. It paid no money at all to Memorex. Moreover, if the Foundation had exercised the warrant, Memorex would have had to issue 350,000 shares to the Foundation. It did not do so, and the Foundation never received any Memorex shares. To complete the hypothetical, the Foundation would then have had to sell its Memorex stock to the underwriters for $48.75 per share, and the latter would have had to pay it that amount per share. This did not happen. The underwriters paid the Foundation for the warrant at $38.75 per share, and paid Memorex $10 per share to exercise the warrant.
 
 
 16
 We are guided by two decisions of the Supreme Court. The first is Reliance Electric Co. v. Emerson Electric Co., 1974, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575. There, Emerson acquired 13.2% of the outstanding common stock of a corporation. Within six months, Emerson sold the stock in two transactions. First, it sold enough to bring its holding down to 9.9%. Then it sold the rest. The court found Emerson liable under § 16(b) for the profits from the first sale, but not liable for the profits from the second. It was no longer a holder of 10% of stock at the time of the second sale. The statute imposes a "flat rule." "Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." 404 U.S. at 422, 92 S.Ct. at 599. The provision "cannot be disregarded simply on the ground that it may be inconsistent with the 'wholesome purpose' of the Act." Id. at 424, 92 S.Ct. at 600. Congress intended to predicate liability upon an "objective measure of proof." "If a 'two-step' sale of a 10% owner's holdings within six months of purchase is thought to give rise to the kind of evil that Congress sought to correct through § 16(b), those transactions can be more effectively deterred by an amendment to the statute that preserves its mechanical quality than by a judicial search for the will-o'-the-wisp of an investor's 'intent' in each litigated case." Id. at 425, 92 S.Ct. at 600.
 
 
 17
 The second Supreme Court decision is Foremost-McKesson, Inc. v. Provident Securities Co., 1976, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464. There, the issue was the interpretation of the statutory provision that § 16(b) "shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved...." The question was whether the person who made a purchase which brought his holding to over 10% held 10% at the time of the purchase. The Court looked to the legislative history of the section and found that the intended reading was before the purchase. It also indicated that this reading would still have been the correct one even had the legislative history been ambiguous because "this statute imposes liability without fault within its narrowly drawn limits," 423 U.S. at 251, 96 S.Ct. at 519. "It is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language. If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference." Id. at 252, 96 S.Ct. at 519.
 
 
 18
 These cases do not compel our decision in this case. They concerned the relatively definite 10% restriction on shareholder liability. Our case is somewhat different. Here, we are asked to go behind the face of the transaction and recharacterize it in terms less favorable to the defendants. However, as Reliance Electric Co. and Foremost-McKesson show, we should not impose liability without fault unless Congress instructs us so to do expressly or by unmistakable inference. The rule of § 16(b) should be read as a flat rule setting objective standards of conduct whenever this is possible. The conduct of the defendants does not fall within the literal language of the section. We do not think that we should extend the scope of the section by recharacterizing the transaction in the way asked by Portnoy.
 
 
 19
 Portnoy draws our attention to a case in the Seventh Circuit where the court said that "the commercial substance of the transaction rather than its form must be considered...." Bershad v. McDonough, 7 Cir., 1970, 428 F.2d 693, 697. However, the facts there were very different from those here. A defendant had purchased stock and had within six months sold an "option" for 14% of the value of the stock, put the stock in escrow, given the purchaser an irrevocable proxy to vote the stock, and resigned from the board of directors, and caused his associates to resign, at the request of the purchaser who replaced them with its own nominees. The option price was applicable to the purchase price of the shares and the option was in fact exercised just over six months from the purchase of the shares. The court found that the date of the option contract was the date of the sale of the stock for the purpose of § 16(b). If we had been faced with those facts we too might have regarded the use of the option as a sham and found the date of stock sale to be that of the option sale. But that is not this case.
 
 
 20
 Here, as counsel for the Foundation point out:
 
 
 21
 The underwriting agreement establishes ... that the Foundation was not free to "speculate" with regard to the conversion of what had formerly been its Memorex warrant or the sale of the converted shares. That conversion and sale took place pursuant to a registered public offering. Not only did the registration statement and prospectus accompanying that offering disclose to the public all material information concerning both Memorex and the transaction, but the underwriting agreement ... controlled the terms upon which the warrant would be sold to the underwriting syndicate, the terms upon which the warrant would be exercised, and the terms upon which the converted shares of common would be offered to the public. That agreement was a compact between Memorex, fourteen selling warrant holders, and more than 100 underwriters constituting the underwriting syndicate. The price at which the converted shares of Memorex common stock was to be sold was arrived at through agreement among all of these parties. Further, the timing of sale of the warrant, the exercise of the warrant, and the subsequent sale of the converted shares was determined by that same process. The Foundation had neither the opportunity, nor the means to speculate. It had the power only to agree to sell its warrant in connection with the offering, or to refuse to be part of that offering and thus retain its warrant.
 
 
 22
 The conversion of what had been the Foundation's warrant and the simultaneous sale of the converted Memorex common stock was accomplished by the firm-commitment underwriters and may not be imputed to the Foundation. (Brief, pp. 27-28)
 
 
 23
 Affirmed.
 
 
 24
 REINHARDT, Circuit Judge, concurring.
 
 
 25
 I concur in the conclusion that the sale of the warrant by the Foundation does not fall within the purview of § 16(b), but for somewhat different reasons than those expressed by my colleagues.
 
 
 26
 Where it is clear from the face of the transaction that there was both "a purchase and sale" of a security by an insider within the statutory period, liability under § 16(b) is imposed without reference to congressional purpose in enacting the statute or the possibility for speculative abuse in the transaction. But where it is not clear from the face of a transaction that it is the type of transaction which the statute prohibits an insider from profiting by, courts employ a flexible, "pragmatic" approach which looks to congressional intent and the possibility for speculative abuse:
 
 
 27
 In deciding whether borderline transactions are within the reach of the statute, courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent-the realization of short swing profits based on access to inside information-thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits.
 
 
 28
 Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 594, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973).
 
 
 29
 Thus, where it is unclear whether a particular transaction is a "purchase," a "sale," or a "purchase and sale", as those terms are used in § 16(b), we apply the flexible, pragmatic approach. "The courts, however, are free to adopt such a flexible approach in construing § 16(b) only in those cases where the relevant provision is either intrinsically ambiguous or in which there are alternative plausible applications of the provision to a particular fact situation." Lewis v. Varnes, 505 F.2d 785, 789 (2d Cir. 1974) (citing Kern County Land Co., 411 U.S. at 594, 93 S.Ct. at 1744). Transactions which on their face do not clearly involve a purchase and a sale, and which therefore require analysis under the pragmatic approach to determine if the possibility for speculative abuse exists, have been described as "unorthodox" transactions. See Kern County Land Co., 411 U.S. at 594, 93 S.Ct. at 1744. The transaction here involved is an unorthodox transaction which, I believe, must be analyzed under the pragmatic approach to determine if § 16(b) applies.[1] I conclude that the transaction does not possess the potential for speculative abuse and therefore does not fall within the purview of § 16(b).
 
 
 30
 The transaction under scrutiny in this case involves the sale of a warrant with the condition that the warrant be exercised immediately. In Kern County Land Co. the Supreme Court expressly acknowledged that "dealings in options, rights, and warrants" (emphasis added) are unorthodox transactions to be analyzed under the pragmatic approach. Id. at 593 n.24, 93 S.Ct. at 1744. In Kern County Land Co., the Supreme Court utilized the pragmatic approach in analyzing a transaction in which the defendant, within six months of acquiring stock in the plaintiff corporation, granted an option to another party to purchase that stock. In concluding that the granting of the option was not a "sale" within the meaning of § 16(b), the Court reasoned that the "option does not appear to have been an instrument with potential for speculative abuse, whether or not (the defendant) possessed inside information...."
 
 
 31
 Similarly, this court has applied the pragmatic approach in analyzing a transaction in which an exchange of one class of stock for another class was followed within six months by the sale of the latter class of stock. Blau v. Max Factor, 342 F.2d 304 (9th Cir.) cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965). In holding that the exchange did not fall within the purview of § 16(b), we explained that
 
 
 32
 to avoid purposeless harshness, a transaction is held not to be a section 16(b) "purchase" if it "was not one that could have lent itself to the practices which Section 16(b) was enacted to prevent."
 
 
 33
 ....
 
 
 34
 Moreover, since there was no speculative advantage in holding Class A (stock) rather than Common, the exchange conferred no opportunity for speculative profit which appellees did not already enjoy. Thus, appellees made only one investment decision in the six months period ....
 
 
 35
 Id. at 307-08 (quoting Ferraiolo v. Newman, 259 F.2d 342, 346 (6th Cir. 1958)).
 
 
 36
 Portnoy contends that the sale of the warrants by the Foundation on the condition that the warrants be "immediately" exercised was a purchase and sale within the meaning of § 16(b). Specifically, Portnoy asserts that "the sale of the warrant under such circumstances was in no way different from and was commercially identical to an exercise by the Foundation of the warrant, with its concommitant purchase of the underlying common stock, and the sale of the stock obtained thereby to the underwriters." There are, of course, obvious differences between the sale of a warrant with the condition that it be exercised immediately and the exercise of a warrant followed by a subsequent sale of the converted stock; the only differences we need consider, however, are those which affect the possibility for speculative abuse by trading on inside information as prohibited by § 16(b).
 
 
 37
 First, we note that § 16(b) was neither intended nor designed to reach all transactions in which parties speculate on the basis of inside information. Rather, the statute was designed to curb speculative abuse of a very specific nature-the use of inside information by statutorily defined insiders to reap short swing profits. The statutory scheme makes it clear that the particular abuse to be prevented is the situation in which an insider purchases or sells a security interest and then, based on inside information, waits for the market price to fluctuate on a short term basis, at which point the insider engages in a second act-a sale or purchase of the security interest-and profits from his speculation.[2]
 
 
 38
 The transaction entered into by the Foundation possessed no possibility for speculative abuse, although the hypothetical transaction that Portnoy claims is "commercially identical" does possess the possibility for such abuse. The sale of a warrant with the condition that it be exercised immediately provides no "span of time" during which the insider can speculate on inside information by waiting for the market price of the stock to change. See Rosen v. Drisler, 421 F.Supp. 1282 (S.D.N.Y.1976) (holding that the sale of an option for an amount equal to the value of the converted shares less the exercise cost was not within § 16(b) because there was no span of time in which the market could fluctuate and inside information could be exploited). Once the Foundation sold the warrant to the underwriters, the Foundation lost any ability it had to exploit inside information as prohibited by § 16(b), because it no longer had ownership or control over the warrant or the converted shares and could not profit from subsequent dealings in the warrant by the underwriters. However, in the situation which Portnoy claims is "commercially identical," the Foundation would have the ability to speculate. Under Portnoy's hypothetical transaction, after the Foundation exercised the warrant, it would be able to sell the converted shares at a time which it knew, because of its inside information, that it would receive the most profit on the sale of the converted shares.
 
 
 39
 Portnoy attempts to circumvent the facts that (1) the Foundation engaged in only the single act of selling the warrant with the condition that it be immediately exercised rather than in two acts (a purchase and a sale), and (2) that the transaction provided no span of time in which the Foundation could have speculated on inside information. He seeks to do so by attributing the subsequent exercise of the warrants to the Foundation. However, the underwriters purchased the warrant as principals for their own accounts and not as agents for the Foundation. That the underwriters were required under the terms of the underwriting agreement to exercise the warrant immediately upon its receipt does not change this conclusion. The sale of the warrant to the underwriters by the Foundation was only part of a much larger public offering organized by Memorex. The choice open to the Foundation was to sell its warrant to the underwriters as part of the offering or to refrain from selling its warrant as the other warrant holders were doing. Once the Foundation chose to enter into the agreement, it was bound by the same terms as all other selling warrant holders, of which there were thirteen in addition to the Foundation. The underwriting agreement obligated the syndicate of 103 underwriters to immediately exercise all warrants purchased from the fourteen warrant holders. Thus, it is clear that the underwriters were not acting as agents for the Foundation merely because the agreement required the underwriters to exercise the warrant immediately upon receipt.[3] Only a single act can therefore be attributed to the Foundation-that of selling the warrant.
 
 
 40
 Moreover, even if Portnoy were correct, and the actions of the underwriters in exercising the warrants could be attributed to the Foundation, there would still be no span of time during which the Foundation could have profited through the exploitation of inside information. Because the underwriters agreement provided that the warrants were to be exercised immediately, a fact which was announced publicly in advance, there was neither the time nor the opportunity for the Foundation to wait for market prices to fluctuate before the warrant was exercised. Such a "simultaneous" transaction provides no opportunity for profit because the market price of the stock is the same at the time of both the purchase and sale.
 
 
 41
 Finally, I would note that even if, by a "commercially identical transaction," Portnoy is referring to an agreement with underwriters pursuant to which a warrant holder is required to convert warrants and immediately transfer the shares to the underwriters for a price established in the agreement, his argument fails. While we need not decide whether such a transaction is covered by § 16(b), I believe that it would not be; we would still be dealing with an "unorthodox" transaction which does not provide the possibility for speculative abuse. However, even if one were to conclude that such a transaction is clearly "a purchase and sale" because two separate actions by the warrant holder are involved, that fact would not be of assistance to Portnoy. The Foundation structured its sale of the warrant so that there was only one action on its part, an action which did not involve the possibility for speculative abuse. "Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972).
 
 
 42
 As stated above, § 16(b) is designed to prevent the exploitation of inside information where the insider has engaged in at least two actions on a short term basis which allow him to profit from the fluctuation in the market price of the stock. Where, as here, an unorthodox transaction is involved, we look to the purpose of § 16(b) and the possibility for speculative abuse in determining whether the statute should apply to the transaction under scrutiny. Under the pragmatic approach set forth in Kern County Land Co., I conclude that (1) the transaction presented no possibility for the type of speculative abuse § 16(b) was intended to prevent, (2) the sale of the warrant with the condition that it be exercised immediately constituted only a single act for purposes of the statute, and (3) section 16(b) does not apply to the sale of the warrant by the Foundation.
 
 
 
 [1]
 The parties agree that the transaction before us is an unorthodox one and that the pragmatic approach is the appropriate method of analysis for determining if § 16(b) applies, and have both argued this appeal on that basis
 I do not read Foremost-McKesson, Inc. v. Provident Securities, Co., 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976), as repudiating the pragmatic approach enunciated in Kern County Land Co., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), nor as requiring a mechanical approach in cases involving unorthodox transactions. In a post-Foremost-McKesson case, we recently attempted to explain when the pragmatic approach is to be applied. We stated that:
 (T)he pragmatic approach is used to determine the boundaries of the statute's definitional scope in borderline situations, especially unorthodox transactions (Kern County Land Co., 411 U.S. at 594-95, 93 S.Ct. at 1744-1745). For a garden-variety transaction which cannot be regarded as unorthodox, the pragmatic approach is not applicable. Mouldings, Inc. v. Potter, 465 F.2d 1101, 1104-05 (5th Cir. 1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1368, 35 L.Ed.2d 591 (1973); Tyco Laboratories, Inc. v. Cutler-Hammer, Inc., 490 F.Supp. 1, 7 (S.D.N.Y.1980); Matas v. Siess, 467 F.Supp. at 220. In such cases, if the situation is within the requirements established by Congress for § 16, then the mechanical, "objective," operation of the statute imposes liability.
 Whittaker v. Whittaker Corp., 639 F.2d 516, 522 (9th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 567, 70 L.Ed.2d 473 (1981).
 Other courts have continued to apply the pragmatic approach when it is necessary to analyze the transaction itself rather than the statutory language of § 16(b). In Matas v. Siess, 467 F.Supp. 217 (S.D.N.Y.1979), the court stated that:
 Although the Court (in Foremost-McKesson) might appear at first blush to be espousing a "strict constructionist" approach to § 16(b), defendants should observe that the court was concerned, in Foremost-McKesson, with a problem of construction as to which it found an ambiguity inherent in the statutory language itself. The problem facing the court here, in contrast, is the treatment of a device which requires analysis to determine whether the statute is applicable.
 Id. at 224. The Matas approach, like the one we took in Whittaker, has considerable merit.
 In any event, in all reported § 16(b) cases which have cited Foremost-McKesson, the courts have recognized the continuing validity of the pragmatic approach enunciated in Kern County Land Co. See Portnoy v. Revlon, Inc., 650 F.2d 895, 898-899 n.5 (7th Cir. 1981); Whittaker v. Whittaker Corp., 639 F.2d 516, 522-523 (9th Cir. 1981); Merrill Lynch, Fenner & Smith v. Livingston, 566 F.2d 1119 (9th Cir. 1978); Portnoy v. Seligman & Latz, Inc., 516 F.Supp. 1188, 1193-1194 (S.D.N.Y.1981); Cutler-Hammer, Inc. v. Leeds & Northrup Co., 469 F.Supp. 1021, 1022-1023 (E.D.Wis.1979); Freedman v. Barrow, 427 F.Supp. 1129, 1148 (S.D.N.Y.1976).
 
 
 [2]
 As noted above, where it is clear that there has been "a purchase and sale" by an insider within the statutory period, liability is imposed without reference to Congressional purpose in enacting the statute. But where it is not clear that a transaction is one which § 16(b) prohibits an insider from profiting by, the pragmatic approach is applied. Thus, inquiry into the possibility for speculative abuse is appropriate only when it is necessary to determine whether the transaction is the type which is covered by the statute. However, once it is determined that § 16(b) is applicable, strict liability or liability without fault is applied. "(T)his statute imposes liability without fault within its narrowly drawn limits." Foremost-McKesson, 423 U.S. at 251, 96 S.Ct. at 519
 
 
 [3]
 There may be circumstances in which an an action by a third party will be attributed to the insider for purposes of § 16(b) liability. If an insider transfers a security interest to a third party, but maintains some control over, and a profit interest in, the security, he may be held liable for a subsequent action by the third party. See Blau v. Mission Corp., 212 F.2d 77 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954)